# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Rasgaitis v. Waterstone Financial Group, Inc.**, 2013 IL App (2d) 111112

---

| | |
|---|---|
| Appellate Court Caption | JEANETTE RASGAITIS and ROBERT RASGAITIS, Plaintiffs-Appellants, v. WATERSTONE FINANCIAL GROUP, INC., RONALD G. FARA, and VICKI M. DIGGLES, Defendants-Appellees (Net National Lending, d/b/a Mortgage Pros, Ltd., Defendant). |
| District & No. | Second District<br>Docket No. 2-11-1112 |
| Filed | February 20, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from defendants' solicitation of plaintiffs to mortgage their residence and invest the equity in life insurance policies and annuities, the count alleging that the firm where defendants worked was guilty of negligence and negligent supervision was barred under the *Moorman* doctrine, which precludes the recovery of solely economic losses under a negligence theory; however, the dismissal of the claims against defendants on the ground that they were barred by the statute of limitations was reversed and the cause was remanded, since the discovery rule tolled the statute of limitations. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 10-L-471; the Hon. John T. Elsner, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

| | |
|---|---|
| Counsel on<br>Appeal | John S. Burke and Andrea R. Zenker, both of Higgins & Burke, P.C., of St. Charles, for appellants. |
| | Peter E. Cooper and Mitchell B. Goldberg, both of Lawrence, Kamin, Saunders & Uhlenhop, LLC, of Chicago, for appellee Waterstone Financial Group, Inc. |
| | Christian T. Kemnitz, Aharon S. Kaye, and Rachel Freyman, all of Katten Muchin Rosenman LLP, of Chicago, for appellee Ronald G. Fara. |
| | Stephen A. Rehfeldt, of Mulherin, Rehfeldt & Varchetto, P.C., of Wheaton, for appellee Vicki M. Diggles. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

## OPINION

¶ 1 The plaintiffs, Jeanette and Robert Rasgaitis, appeal from the trial court's dismissal of their second amended complaint. The trial court dismissed the complaint on the basis that it was barred by the statute of limitations. The plaintiffs' complaint alleged claims against the defendants, Waterstone Financial Group, Inc. (Waterstone), Ronald Fara, and Vicki Diggles, for alleged fraud in soliciting the plaintiffs to mortgage their home and invest the equity in certain life insurance policies and annuities. We affirm in part, reverse in part, and remand for additional proceedings.

¶ 2                         I. BACKGROUND

¶ 3 The plaintiffs filed their original complaint on April 12, 2010, and their first amended complaint on September 8, 2010. The defendants filed motions to dismiss the plaintiffs' complaint pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2008)). On March 7, 2011, following argument on the motions, the trial court dismissed the plaintiffs' first amended complaint without prejudice, with leave to refile.

¶ 4 The plaintiffs' second amended complaint was filed on April 8, 2011. The complaint alleged as follows. The plaintiffs are married. Waterstone is an investment advisory firm and an independent brokerage firm. Waterstone is licensed to provide financial services and also sells products including securities, annuities, and life insurance policies. Waterstone is a member of the Financial Industry Regulatory Authority (FINRA).

¶ 5     The complaint alleged that, during the relevant time frame, Fara was registered with the State of Illinois as an agent of Waterstone to sell financial products and offer investment advice. Fara operated a registered branch office of Waterstone in Oak Brook. The office was identified as a Waterstone branch office in the building directory on the first floor and on signs located in the office. Waterstone allowed Fara to provide business cards "identifying Fara as a registered representative with and offering the sale of securities through Defendant Waterstone." Pursuant to FINRA rules, Waterstone was required to supervise Fara. Fara was also registered as an investment advisor for "Fara and Diggles Wealth Management LLC." Fara represented to the general public that this business entity was also affiliated with Waterstone. Fara used the same Waterstone office and telephone number when operating his outside business entities.

¶ 6     According to the complaint, Diggles was held out to the public as a partner of Fara and an actual or apparent agent of Waterstone. Diggles worked out of Fara's Waterstone office performing duties for the benefit of Waterstone at the direction of Fara. Waterstone allowed Fara to hold out Diggles as a financial planner in the business he operated out of the Waterstone office.

¶ 7     In March 2004, December 2004, August 2005, and May 2006, FINRA warned its members, including Waterstone and Fara, that 100% mortgages were not suitable and that investors were not aware of the significant risks of 100% mortgages. Despite these warnings, Waterstone by and through its agents Fara and Diggles intentionally and fraudulently (1) advised the plaintiffs to mortgage near all of the equity in their home and invest in "an investment plan" proposed by Fara; (2) reassured the plaintiffs that the investment plan was appropriate for their needs; (3) reassured the plaintiffs that the investment plan was "safe and secure"; and (4) advised the plaintiffs to invest in equity-indexed annuities without any attempt to explain the associated fees, expenses, and surrender charges.

¶ 8     The complaint alleged the following specific facts. On or about September 19, 2006, the plaintiffs received a written solicitation to attend a seminar entitled "Mortgage mistakes and Misconceptions: how to save a fortune on your mortgage." The written solicitation stated that Fara would "educate homeowners on the many mistakes they could be making on their home mortgage." Waterstone either did review and approve or should have reviewed and approved the content of the seminar. The plaintiffs attended the seminar because they wanted to pay off the balance of their mortgage prior to retirement. At the October 3, 2006, seminar Fara indicated that his investment plan had been successful for other clients. On October 15, 2006, the plaintiffs met with Fara and Diggles at Fara's Waterstone office to discuss the investment plan, which involved mortgaging their home and investing the proceeds. Fara again indicated that his plan had been successful with other clients, who earned generous returns.

¶ 9     On October 20, 2006, the plaintiffs met with Fara and Diggles for a second time at the Waterstone office. At that meeting, the plaintiffs provided the defendants with information concerning their financial status. They informed Fara that the balance on their mortgage was $66,000 and that they had about $250,000 in equity in their home. They told Fara that their primary financial objectives were to pay off their mortgage and earn income for retirement. They also provided information about their Charles Schwab individual retirement accounts (IRAs) that were invested in Standard & Poor (S&P) indexed mutual funds. Fara informed

the plaintiffs that there were benefits to mortgaging their home and investing the equity. Fara represented that (1) the funds the plaintiffs invested through Fara would be 100% safe and guaranteed; (2) his investment plan was a proven method to increase their net worth; (3) his plan would provide more than enough funds to pay off their mortgage and provide retirement income; and (4) the plaintiffs' funds would always be available to pay off their proposed second mortgage at any time.

¶ 10 On October 29, 2006, the plaintiffs met with Fara and Diggles for a third time at the Waterstone office. At that meeting, Fara presented the plaintiffs with a personalized binder that promised guaranteed benefits after implementation of Fara's investment plan. Fara represented that his investment plan, involving their home and both of their IRAs, would result in hundreds of thousands of dollars in benefits. Specifically, Fara told the plaintiffs that his investment plan would generate returns to pay off their mortgage; provide them with retirement income; be safe and appropriate, offering high returns without risk of loss; and result in tax benefits of 31%. Fara also told them that they could remove their funds from his investment plan at any time. Fara represented that his investment plan would provide guaranteed safe returns of $96,376 above the costs of the mortgage.

¶ 11 The next day, the plaintiffs again met with Fara and Diggles at the Waterstone office. The purpose was to implement the investment plan. The investment plan was to mortgage the plaintiffs' home to nearly 100% of its value and use the equity to purchase a five-year term annuity that would fund two life insurance policies. The plaintiffs signed various papers at this meeting but alleged that Fara and Diggles did not explain or show all of the various papers to them but, rather, just indicated where they should sign. Fara and Diggles again represented to the plaintiffs that their funds could be removed from the investment plan at any time and be used to pay off the proposed $280,000 mortgage. Fara and Diggles stated that they would provide a breakdown describing how the assets were invested in the plan. The plaintiffs signed applications for the life insurance policies. Diggles sold the mutual funds in the plaintiffs' respective Charles Schwab IRAs. The plaintiffs also signed application forms for "Midland individual flexible premium equity indexed annuities."

¶ 12 On November 17, 2006, the plaintiffs obtained a 30-year adjustable rate mortgage on their home in Wheaton for $280,000. The plaintiffs were issued funds of $213,115.56. The defendants failed to tell the plaintiffs that the loan they were taking out was a subprime mortgage with interest rates above the market rate. The mortgage included enhanced fees and incentive payments to Fara for initiating the mortgage.

¶ 13 On or about November 29, 2006, the plaintiffs signed the application for a "Great American Single-Premium Immediate Annuity," contract number 06007934. The single premium payment was $213,125.56, which represented the full amount of the proceeds from the new mortgage on their home. The Great American annuity was to give the plaintiffs five annual payments of $43,942.07, with the first payment to be issued on January 1, 2007. The first payment was used to pay the initial premium payments on the plaintiffs' life insurance policies. The initial premium payment on Jeanette's Midland universal life insurance policy, number 1502731746, with a policy date of January 1, 2007, was $23,050. The initial premium payment on Robert's Midland universal life insurance policy, number 1502731736, with a policy date of January 4, 2007, was $20,892.

¶ 14 In January 2007, funds were received from the sale of the plaintiffs' Charles Schwab IRA mutual funds. On January 9, 2007, a Midland individual flexible premium equity-indexed annuity, number 8500292198 in Jeanette's name, was issued for an initial premium payment of $21,753.63. On January 30, 2007, Midland individual flexible premium equity-indexed annuity number 8500293080 in Robert's name was issued for an initial premium payment of $19,707.03.

¶ 15 The plaintiffs further alleged that Fara's investment plan was unsuitable and could never earn the returns promised. After the fifth premium payment for the Great American annuity, the annuity would be exhausted and the plaintiffs would be unable to afford the continuing annual premiums on their life insurance policies. The life insurance policies "would then lapse due to insufficient cash value to maintain coverage." Fara failed to inform the plaintiffs that, short of one of them dying, "the guaranteed returns illustrated would never be attainable." Fara failed to inform them that it would be impossible for them to fully recover their investments and pay off their $280,000 mortgage. The annuities funded with the plaintiffs' IRAs caused the plaintiffs "to incur excessive annual fees and commissions." Moreover, the two Midland annuities were no different from the plaintiffs' Charles Schwab indexed mutual fund IRAs, and the Schwab IRAs contained no additional fees and commissions. The defendants failed to inform the plaintiffs that their life insurance policies and Midland annuities were subject to significant surrender charges.

¶ 16 The plaintiffs further alleged, on information and belief, that the defendants earned significant commissions on the sale of the life insurance policies and Midland annuities, and for the initiation of the mortgage. The defendants also solicited the plaintiffs to deposit $20,000 into Midland flexible premium equity-indexed annuity number 8500292024, which was issued on November 21, 2006. The defendants earned a commission in excess of $2,000 on this annuity. The defendants failed to inform the plaintiffs that this annuity was subject to a surrender charge of up to 10% for the first seven years.

¶ 17 Finally, the plaintiffs alleged that the defendants continued to misrepresent that the investment plan was working. At a January 30, 2008, meeting at the Waterstone office, the plaintiffs inquired about the safety of the investment plan and Fara told them "that their money was safely invested in his plan and available to pay-off their mortgage in its entirety if Plaintiffs decided to do so." Fara also stated that his investment plan was generating large returns that would be available in the following years. In August 2008 they called Diggles to express concern over their investments due to the volatility of the stock market. Diggles assured them that their money was safe and earning good returns without risk of loss.

¶ 18 In February 2009, the plaintiffs left multiple messages at the Waterstone office, but received no responses. They then sought out other professional investment advice. After receiving other advice, they learned that Fara's investment plan could never earn the returns promised and that Fara's and Diggles' representations were false. "The only way the 'investment plan' could generate a positive return would be if one or both of the [p]laintiffs died causing the survivor to receive the insurance death benefits." The sale of the Schwab IRA mutual funds to buy S&P 500-indexed annuities was not suitable. The promise of guaranteed returns was false.

¶ 19      The plaintiffs alleged that the defendants earned over $40,000 in fees and bonuses due to the home mortgage and over $30,959 in commissions on the first-year premiums for the respective policies and annuities. Additionally, the plaintiffs incurred $10,405 in unnecessary closing costs, paid over $75,249 in unnecessary interest-only mortgage payments, and incurred $25,937.39 in unnecessary surrender charges when removing their money from the investment plan.

¶ 20      The plaintiffs' second amended complaint, filed April 8, 2011, alleged 15 counts against the defendants. The plaintiffs alleged claims against Waterstone for fraudulent concealment (count I), breach of fiduciary duty (count II), consumer fraud (count III), common-law fraud (count IV), and negligence and negligent supervision (count V). The plaintiffs alleged claims against Fara for fraudulent concealment (count VI), breach of fiduciary duty (count VII), consumer fraud (count VIII), and common-law fraud (count IX). The plaintiffs alleged claims against Diggles for fraudulent concealment (count X), consumer fraud (count XI), common-law fraud (count XII), conspiracy to defraud (count XIII), aiding and abetting (count XIV), and breach of fiduciary duty (count XV).

¶ 21      On June 20, 2011, Fara filed a combined motion to dismiss the plaintiffs' amended complaint pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2008)). Diggles filed a similar motion that same day. Fara and Diggles argued that the plaintiffs' complaint involved the sale of life insurance and securities and was therefore barred by the two- and three-year limitations periods contained in section 13-214.4 of the Code (735 ILCS 5/13-214.4 (West 2008)) and section 13 of the Illinois Securities Law of 1953 (Securities Law) (815 ILCS 5/13 (West 2008)). They further argued that the alleged misrepresentations were forward-looking statements that could not give rise to claims for fraud. They also argued that the complaint should be dismissed for failure to attach the written policies and annuity contracts to the complaint. Finally, they alleged that the documents contained cautionary language that negated the plaintiffs' claims. Diggles attached her own affidavit to her motion to dismiss. Attached to Diggles' affidavit were portions of the documents. The portions attached included the alleged "cautionary language."

¶ 22      On June 27, 2011, Waterstone filed a motion to dismiss the plaintiffs' second amended complaint pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2008)) and a separate motion to dismiss pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)). Waterstone argued that the first four counts of the complaint failed to state a cause of action, because the plaintiffs failed to properly allege that Fara and Diggles were agents of Waterstone. Waterstone argued that the claim for negligence failed because Waterstone did not owe the plaintiffs any duty of care, the plaintiffs failed to allege any injury, and the claim was barred by the economic-loss doctrine.

¶ 23      On October 6, 2011, following argument, the trial court entered an order dismissing, pursuant to section 2-619 of the Code, the plaintiffs' second amended complaint with prejudice as time barred. The trial court found that the plaintiffs purchased life insurance or securities and that they were given documents containing the exact parameters of the investments at that time. The trial court held that the plaintiffs were bound by the information contained in the documents. The claims thus were dismissed as barred by the two- and three-year statutes of limitations for insurance (735 ILCS 5/13-214.4 (West 2008)) and annuities

(815 ILCS 5/13 (West 2008)). The plaintiffs filed a timely notice of appeal.

¶ 24                                    II. ANALYSIS

¶ 25       On appeal, the plaintiffs argue that the trial court erred in finding their claims barred by the two-year limitations period set forth in section 13-214.4 of the Code. The plaintiffs argue that their consumer fraud claims are governed by the three-year limitations period provided for in section 10a of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/10a (West 2008)) and that the remaining claims are governed by the five-year limitations period set forth in section 13-205 of the Code, which provides such limitation for "all civil actions not otherwise provided for" (735 ILCS 5/13-205 (West 2008)). The plaintiffs further argue that, even if the two-year statute of limitations applied to their claims, they still were not barred, because the discovery rule tolled the statute of limitations. Alternatively, if not tolled by the discovery rule, the plaintiffs argue that the statute of limitations was tolled by the defendants' fraudulent concealment.

¶ 26       In addition to responding to the plaintiffs' arguments raised on appeal, Fara and Waterstone argue that the trial court's dismissal of the plaintiffs' complaint could be affirmed on other grounds. Fara argues that the dismissal of the complaint could be affirmed for failure to state a cause of action because all the statements attributed to Fara involved forward-looking statements, which are an improper basis for claims of fraud. Fara and Waterstone argue that the dismissal also could be affirmed because the plaintiffs failed to attach the documents to their complaint, in violation of section 2-606 of the Code (735 ILCS 5/2-606 (West 2008)). Waterstone further argues that the complaint could be dismissed for failure to state any cause of action against Waterstone, because the plaintiffs failed to properly allege that Fara and Diggles were agents of Waterstone or that Waterstone owed the plaintiffs a duty of care.

¶ 27                              A. Plaintiffs' Arguments

¶ 28       The plaintiffs' first contention on appeal is that the trial court erred in finding that the two-year limitations period set forth in section 13-214.4 of the Code (735 ILCS 5/13-214.4 (West 2008)) applied to their claims. We need not address this argument, as the plaintiffs' subsequent argument, that the discovery rule tolled the applicable statute of limitations, is dispositive of the issue. Even if the two-year statute of limitations applied to the plaintiffs' claims, under the discovery rule the plaintiffs' complaint was timely filed.

¶ 29       The defendants' motions to dismiss based on a statute of limitations were brought under section 2-619 of the Code (735 ILCS 5/2-619 (West 2008)). A motion pursuant to section 2-619 admits the legal sufficiency of the plaintiff's claims and accepts all well-pleaded facts as true, but asserts an affirmative defense or other matter that would defeat the plaintiff's claims. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993). "When a court rules on a section 2-619 motion to dismiss, it 'must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party.' " *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367-68 (2003). We review *de novo* a dismissal pursuant to section 2-619. *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002).

¶ 30    Pursuant to the "discovery rule," a statute of limitations starts to run "when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415 (1981). Generally, determining the point at which the running of the limitations period begins under the discovery rule is a question of fact. *Vogt v. Bartelsmeyer*, 264 Ill. App. 3d 165, 173 (1994). However, where it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court. *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981). The discovery rule can be applied to actions covered by section 13-214.4 of the Code (*State Farm Fire & Casualty Co. v. John J. Rickhoff Sheet Metal Co.*, 394 Ill. App. 3d 548, 566 (2009)), as well as to actions brought under the Consumer Fraud Act. *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1021 (2007).

¶ 31    Taking as true the well-pleaded facts of the plaintiffs' complaint, we conclude that the plaintiffs could not have reasonably known of their injury or that it was wrongfully caused until February 2009 when Fara and Diggles did not return their phone calls. The plaintiffs alleged that the defendants made numerous misrepresentations regarding the benefits of refinancing the mortgage on their home to purchase life insurance policies and annuities, including benefits of investment gains, liquidity, safety, and lower taxes. Despite FINRA's warnings of the complex nature of equity-indexed annuities and the risks of funding investments via a full mortgage, the defendants recommended such to the plaintiffs. The plaintiffs alleged that in January 2008 and in August 2008 they inquired as to the safety of the plan and the availability of funds to pay off their mortgage. At both those times, the defendants assured the plaintiffs that their money was earning good returns without risk of loss. The plaintiffs further alleged that it was not until February 2009, when Fara and Diggles did not return their phone calls, that they sought other professional advice and learned that the "investment plan" could never generate the returns represented. Accordingly, the statute of limitations began to run in February 2009 and the plaintiffs' complaint, filed in April 2010, was within the two-year statute of limitations for actions against insurance producers and within the three-year statute of limitations for consumer fraud actions. Based on our determination that the discovery rule tolled the running of the statute of limitations, we need not address the plaintiffs' argument that the statute of limitations was tolled by the defendants' fraudulent concealment.

¶ 32    The defendants argue that the plaintiffs failed to set forth sufficient facts to avoid the statute of limitations, because the life insurance policies and annuity contracts contained language putting the plaintiffs on notice of the investment risks. Specifically, the defendants point out that, in the application for the life insurance policies, the plaintiffs signed below a statement that "current illustrated values are based on past Index performance and are not intended to predict future performance." In the same application, the plaintiffs acknowledged that "any values shown, other than guaranteed minimum values, are not guarantees, promises or warranties." In the life insurance policy illustrations, also signed by the plaintiffs, the plaintiffs acknowledged that they understood that "this illustration assumes that the currently illustrated non-guaranteed elements will continue unchanged for all years shown. This is not likely to occur and actual results may be more or less favorable than those shown." In the disclosure statements of the annuities, each plaintiff acknowledged that "I have received a

copy of the product brochure and Company disclosure material for this contract" and that "any values shown, other than the guaranteed minimum values, are not guarantees, promises or warranties." The disclosures on the life insurance policies and the two Midland annuities indicated that there were surrender charges for early withdrawal.

¶ 33 The defendants argue that the disclosure documents were clearly drafted to be read by an audience of laymen, not financial advisors, and that these disclosures were sufficient to put the plaintiffs on notice that the defendants' alleged misrepresentations were false. In arguing that the disclosures negate the plaintiffs' claims, the defendants cite *Lagen v. Balcor Co.*, 274 Ill. App. 3d 11, 18 (1995), for the proposition that, where allegedly false statements are accompanied by meaningful cautionary language, those allegedly false statements are rendered immaterial.

¶ 34 In *Lagen*, the plaintiffs alleged that the defendants' failure to disclose material facts fraudulently induced the plaintiffs to become limited partners in various real estate enterprises. *Id.* at 17. On appeal, this court held that "[i]t is well established that meaningful cautionary language in an offering document can negate the materiality of any alleged misrepresentation or omission and may thus form the basis for granting a motion to dismiss for failure to state a cause of action." *Id.* at 18. We noted that this principle was known as the "bespeaks caution" doctrine. The plaintiffs had been sent documentation that served as offers to invest in the limited partnerships. *Id.* at 15. We found that the offering documents at issue were "replete with cautionary language warning potential investors of the risks attendant to limited partnerships, conflicts of interests, compensation and fees owed defendants and the tax aspects and uncertainties of the proposed investments." *Id.* at 19. We affirmed the section 2-615 dismissal of the plaintiffs' complaint. *Id.* at 20.

¶ 35 *Lagen* is distinguishable from the present case. In *Lagen*, the plaintiffs claimed that the defendants did not warn them of or concealed the existence of facts that, as a whole, pointed toward an impending decline in the real estate market. In contrast, the plaintiffs in the present case claimed that the defendants, despite having been warned by FINRA, failed to disclose the complex nature of equity-indexed annuities and the known risks of funding investments through a full residential mortgage. "The 'bespeaks caution' doctrine cannot shield defendants' statements from liability where it is alleged that defendants possessed material adverse information which they failed to disclose at the time of the offering." *Olczyk v. Cerion Technologies, Inc.*, 308 Ill. App. 3d 905, 915 (1999).

¶ 36 Furthermore, cautionary language must be detailed and specific and general risk warnings or mere boilerplate is not sufficient to prevent misinformation. *In re NationsMart Corp. Securities Litigation*, 130 F.3d 309, 317 (8th Cir. 1997). In *Lagen*, the cautionary language was extensive, involving multiple paragraphs contained in pamphlets, some over 100 pages long, addressing a multitude of risks. *Lagen*, 274 Ill. App. 3d at 15, 19-20. In the present case, the cautionary language consisted of nothing more than single statements that there was no guaranteed return from any of the individual life insurance policies or annuities. It was neither detailed nor specific. The disclosure statements at issue did not address the known risks of 100% mortgages and did not explain any of the risks of the investment plan or equity-indexed annuities in a sufficiently substantive manner.

¶ 37 The defendants also argue that the discovery rule is inapplicable because of the built-in period of repose contained in section 13 of the Securities Law. Section 13 provides:

> "D. No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after 3 years from the date of sale; provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of subsection E, F, G, H, I or J of Section 12 of this Act which is the basis for the action, the 3 year period provided herein shall begin to run upon the earlier of:

> > (1) the date upon which the party bringing the action has actual knowledge of the alleged violation of this Act; or

> > (2) the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable." 815 ILCS 5/13(D) (West 2008).

This argument is without merit for two reasons. First, the life insurance policies and annuities are not securities. The exhibits attached to Diggles' affidavit indicate that the life insurance policies and annuities were not registered as securities. Accordingly, this action is not governed by the Securities Law. Second, even if the repose period in the Securities Law did apply, the plaintiffs' complaint would still not be time barred. Based on our foregoing analysis regarding the discovery rule, we would similarly find that the plaintiffs did not have notice of facts leading to actual knowledge of the alleged violations of the Securities Law until February 2009. Their complaint, filed in April 2010, would be within the three-year statute of limitations and the five-year statute of repose.

¶ 38                                    B. Defendants' Arguments

¶ 39                                    1. *Forward-Looking Statements*

¶ 40 Fara argues that, even if we do not affirm on the basis of the statute of limitations, we should affirm the dismissal of the claims for consumer fraud and common-law fraud, pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)), for failure to state a cause of action. Specifically, Fara argues that all the statements attributed to him in the complaint were entirely forward-looking statements, which cannot give rise to a cause of action for consumer or common-law fraud. "[A]ssurances as to future events are generally not considered misrepresentations of fact." *Power v. Smith*, 337 Ill. App. 3d 827, 832 (2003). "Generally, financial projections are considered to be statements of opinion, not fact." *Lagen*, 274 Ill. App. 3d at 17.

¶ 41 The plaintiffs argue that Fara's statements were not opinions or promises of future action. Rather, they argue that Fara knew the investments could never live up to the returns he had promised the plaintiffs. The plaintiffs further argue that Fara's representation that he had achieved positive results in the past with the same investment scheme was a misrepresentation of past performance, not promised future action.

¶ 42    Generally an expression of opinion will not support an action for fraud. *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483, 489 (1981). However, where a representation as to value is made as a statement of fact for the listener to rely upon, rather than a mere expression of opinion, the representation is treated as a statement of fact. *Id.* As quoted in *Duhl*:

> " 'Wherever a party states a matter which might otherwise be only an opinion but does not state it as the expression of the opinion of his own but as an affirmative fact material to the transaction, so that the other party may reasonably treat it as a fact and rely upon it as such, then the statement clearly becomes an affirmation of the fact within the meaning of the rule against fraudulent misrepresentation. Statements of value are common examples, and where made in pursuance of a scheme on the part of the defendant to induce plaintiff to trade with him such statements constitute fraud and deceit.' " *Id.* (quoting *Buttitta v. Lawrence*, 346 Ill. 164, 173 (1931)).

"Thus, the general rule is that it is not 'the form of the statement which is important or controlling, but the sense in which it is reasonably understood.' " *West v. Western Casualty & Surety Co.*, 846 F.2d 387, 394 (7th Cir. 1988) (quoting Prosser and Keeton on Torts § 109, at 755 (W. Page Keeton *et al.* eds., 5th ed. 1984)). "Whether a statement is one of fact or of opinion depends on all the facts and circumstances of a particular case." *Id.* at 393 (citing *Buttitta*, 346 Ill. at 173).

¶ 43    No cause of action should be dismissed on the pleadings unless it clearly appears that no set of facts can be proved under the complaint entitling the plaintiffs to relief. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86-87 (1996). In the present case, the plaintiffs have sufficiently alleged that the statements made by Fara and Diggles were representations of fact rather than opinion. The plaintiffs alleged that Fara and Diggles represented that their funds were 100% safe and that the investment plan was a *proven* method to increase their net worth. The plaintiffs also alleged that Fara and Diggles promised them guaranteed benefits and $96,000 in returns in five years. Accordingly, it would be improper to dismiss the plaintiffs' claims for consumer fraud and common-law fraud, as the statements at issue, as alleged, were not matters of opinion. *Duhl*, 102 Ill. App. 3d at 489.

¶ 44                            2. *Failure to Attach Written Instruments*

¶ 45    Waterstone and Fara next argue that, since the complaint was based on alleged misrepresentations as to the life insurance policies and annuities, the plaintiffs were required to attach those documents to the complaint. Section 2-606 of the Code provides that if a claim "is founded upon a written instrument, a copy thereof, or of so much of the same as is relevant, must be attached to the pleading as an exhibit or recited therein, unless the pleader attaches to his or her pleading an affidavit stating facts showing that the instrument is not accessible to him or her." 735 ILCS 5/2-606 (West 2008); see also *Sherman v. Ryan*, 392 Ill. App. 3d 712, 733 (2009). The exhibits to which section 2-606 applies generally consist of instruments being sued upon, such as contracts. *Garrison v. Choh*, 308 Ill. App. 3d 48, 53 (1999). In the present case, the plaintiffs' claims are not based on breach of the life insurance contracts or annuity contracts. Rather, the claims are founded on alleged misrepresentations that induced the plaintiffs to purchase the insurance policies and

-11-

annuities. Accordingly, the policies and annuities did not need to be attached to the plaintiffs' complaint.

¶ 46                              3. *Failure to Allege an Agency Relationship*

¶ 47      Waterstone argues that the first four counts of the plaintiffs' complaint should be dismissed pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2008)) for failure to state a cause of action. Specifically, Waterstone notes that the claims for fraudulent concealment, breach of fiduciary duty, consumer fraud, and common-law fraud are based on the theory of agency. Waterstone argues that the plaintiffs have failed to sufficiently allege that Fara and Diggles acted with either actual authority or apparent authority as Waterstone's agents in dealings with the plaintiffs.

¶ 48      "An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf." *Zahl v. Krupa*, 365 Ill. App. 3d 653, 660 (2006). An agent's authority can be either actual or apparent. Actual authority can be either express or implied. Express authority occurs when a principal explicitly grants the agent authority to perform a particular act. *Id.* at 660-61. Implied authority is actual authority proved circumstantially by evidence of the agent's position. *Id.* at 661. It arises when the conduct of the principal, reasonably interpreted, causes the agent to believe that the principal desires him to act on the principal's behalf. See Restatement (Second) of Agency § 26 (1958). Apparent authority occurs "when the principal holds an agent out as possessing the authority to act on its behalf, and a reasonably prudent person, exercising diligence and discretion, would naturally assume the agent to have this authority in light of the principal's conduct." *Zahl*, 365 Ill. App. 3d at 661.

¶ 49      In determining whether the allegations of the plaintiffs' complaint established apparent authority we find *Zahl* instructive. In *Zahl*, the plaintiffs appealed the section 2-615 dismissal of their claims against the defendants, Jones & Brown Co., Inc., and its directors and officers, including its president, Ronald Krupa. *Id.* at 655. The plaintiffs had alleged that they were swindled by Krupa when he convinced them to invest in a fund, the "Scudder" fund, that he claimed was open only to officers and directors of Jones & Brown and their friends and families. *Id.* Krupa ultimately failed to invest the plaintiffs' funds and lost their money through gambling. *Id.* at 656. The plaintiffs' breach-of-contract and fraud counts were premised on the assertion that Krupa acted as the agent or apparent agent of Jones & Brown. *Id.* at 657. This court determined that the plaintiffs had pled sufficient facts that, if true, would prove that Krupa acted with the apparent authority of Jones & Brown in taking the plaintiffs' money. *Id.* at 663. The plaintiffs had pled that Jones & Brown employed Krupa for at least 20 years and had supplied him with an office, a phone, and company letterhead. This court held that this created the impression that Krupa had authority from Jones & Brown to act as he did. *Id.* The plaintiffs had also alleged that their decision to invest in the Scudder fund was based on their past successes in investing with Krupa. *Id.* This was held to establish that the plaintiffs reasonably believed that Jones & Brown permitted outside parties to invest in the Scudder fund and that Krupa was acting with authority from Jones & Brown. *Id.*

¶ 50      In the present case, the plaintiffs have alleged facts that, if proven, would entitle the

plaintiffs to relief from Waterstone under a theory of apparent agency. First, according to the allegations, Fara had been an authorized representative of Waterstone for four years. Waterstone was in the business of providing financial planning services. Waterstone was also licensed to sell variable life insurance policies and annuities. Fara operated a branch office for Waterstone. The office was identified as a Waterstone branch office on the directory of the building where the office was located. These facts created the impression that Fara had authority from Waterstone when providing financial planning services to the plaintiffs. Additionally, the allegations support the plaintiffs' reasonable belief that Fara was at all times acting under the authority of Waterstone. Fara ran his outside business activities out of the Waterstone office and with the same phone number as that of Waterstone. The five business meetings between Fara, Diggles, and the plaintiffs occurred at the Waterstone office.

¶ 51 The plaintiffs also have sufficiently alleged an apparent agency relationship between Diggles and Waterstone. Generally, "a corporation is only a legal entity and can act only through a person." *Shapiro v. DiGuilio*, 95 Ill. App. 2d 184, 192 (1968). Plaintiffs are entitled to consider an agent's words and conduct as those of the principal itself where it is reasonable to do so. *Zahl*, 365 Ill. App. 3d at 661. The plaintiffs alleged that Diggles worked from Fara's Waterstone office and that Fara held out Diggles as a financial planner in the businesses he ran out of the Waterstone office. Accordingly, Waterstone, through Fara, created the impression that Diggles had authority from Waterstone in providing services to the plaintiffs. The plaintiffs' belief that Diggles was acting under the authority of Waterstone was reasonable since Diggles was working out of the Waterstone office and the parties had multiple meetings at that office. Accordingly, the plaintiffs have sufficiently pled apparent authority to withstand a section 2-615 dismissal.

¶ 52 *4. Negligence Claim and the Moorman Doctrine*

¶ 53 Waterstone next argues that the plaintiffs' negligence claim (count V) is barred by the economic-loss doctrine. In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69, 91 (1982), the supreme court held that a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." Economic damages are " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits–without any claim of personal injury or damage to other property ***' [citation] ***." *Id.* at 82. Based on this definition, to the extent that the plaintiffs allege negligence committed by Waterstone itself, their claim is barred by the *Moorman* doctrine because the plaintiffs are requesting only economic damages.

¶ 54 The plaintiffs, relying on *Van Horne v. Muller*, 294 Ill. App. 3d 649, 658 (1998) (*Van Horne I*), argue that a complaint stating a cause of action for negligent supervision need not allege physical injury. This is in fact what the appellate court held in that case. However, the appellate court did not specifically discuss the *Moorman* doctrine in that case. On review, the Illinois Supreme Court reversed the appellate court's holding in part. *Van Horne v. Muller*, 185 Ill. 2d 299, 316 (1998) (*Van Horne II*). However, the supreme court refused to

consider whether a claim for negligent supervision needed to allege a physical injury, finding that the negligent supervision claim failed for other reasons. *Id.* at 311-12. The supreme court also did not address the *Moorman* doctrine.

¶ 55   The plaintiffs' argument is without merit. Whether there is a physical injury in this case is not the issue. The issue is whether the plaintiffs are seeking solely economic losses, which they are. Pursuant to *Moorman*, a plaintiff cannot recover such losses under a theory of negligence. Accordingly, their claim is barred.

¶ 56   The plaintiffs further argue that, even if the *Moorman* doctrine applies to their negligence claim against Waterstone, the claim falls under one of the recognized exceptions. There are three well-known exceptions to the *Moorman* doctrine: "(1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence [citation]; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false misrepresentation, *i.e.*, fraud [citation]; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions [citation]." (Emphasis omitted.) *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 199 (1997). In addition to these three, the Illinois Supreme Court also has stated that an exception applies where the tort duty is extracontractual. *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 162 (1994). The plaintiffs argue that their claim falls within the second and third exceptions. We disagree.

¶ 57   In a claim for negligent supervision it is the employer's wrongful act rather than the employee's wrongful act that is at issue. *Van Horne II*, 185 Ill. 2d at 311. The plaintiffs have not alleged either any intentional or any negligent misrepresentations by Waterstone itself. Rather, they allege that Waterstone failed to adequately supervise Fara and Diggles. Accordingly, their claim does not fall within the second or third exception to the *Moorman* doctrine noted above. We therefore agree that the dismissal of count V against Waterstone may be affirmed on the basis of the *Moorman* doctrine. See *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 460 (2006) (a reviewing court may affirm on any basis appearing in the record regardless of the trial court's reasoning). Based on this determination, we need not address Waterstone's argument that the dismissal of the negligence/negligent supervision claim should be affirmed for failure to state a cause of action.

¶ 58                               III. CONCLUSION

¶ 59   For the foregoing reasons, we affirm the dismissal of count V of the plaintiffs' complaint, alleging a cause of action against Waterstone for negligence and negligent supervision. We reverse the dismissal of the remaining claims and remand for further proceedings consistent with this opinion.

¶ 60   Affirmed in part and reversed in part; cause remanded.