2015 IL App (2d) 140952
No. 2-14-0952
Opinion filed June 29, 2015

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ARMIN ABAZARI, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 13-L-856 |
| | ) | |
| ROSALIND FRANKLIN UNIVERSITY OF | ) | |
| MEDICINE AND SCIENCE, DR. WILLIAM | ) | |
| M. SCHOLL COLLEGE OF PODIATRIC | ) | |
| MEDICINE, and ROSALIND FRANKLIN | ) | |
| UNIVERSITY HEALTH SYSTEM, | ) | Honorable |
| | ) | Diane E. Winter, |
| Defendants-Appellees. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justice McLaren specially concurred, with opinion.
Justice Birkett concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    After the plaintiff, Armin Abazari, graduated from the Dr. William M. Scholl College of Podiatric Medicine (Scholl College) of the Rosalind Franklin University of Medicine and Science (RFUMS), he was unable to obtain a placement in any of the residency programs to which he applied. Frustrated by the shortage of residency slots available compared to the number of podiatry school graduates, he filed suit against Scholl College, RFUMS, and the Rosalind Franklin University Health System. The circuit court of Lake County dismissed his amended complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)) for failure to state a claim. The plaintiff, acting *pro se*,

appeals the dismissal. We affirm the judgment but modify it to reflect that the dismissal of part of count II is without prejudice, and remand.

¶ 2                                    BACKGROUND

¶ 3    The following facts are drawn primarily from the allegations of the amended complaint which, at this point in the proceedings, must be taken as true unless contradicted by other allegations or by the contents of an exhibit attached to the complaint. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 8-9 (1992); *Farmers Automobile Insurance Ass'n v. Danner*, 394 Ill. App. 3d 403, 412 (2009). The following is a summary; additional facts are discussed in the context of particular legal arguments.

¶ 4    In 2003, RFUMS applied to the Illinois Board of Higher Education (IBHE) for permission to operate a program (Scholl College) offering the degree of "Doctor of Podiatric Medicine" (DPM). In its description of the proposed program, RFUMS included the statement that "[a]fter graduation Scholl College places its graduates in 24[-] and 36[-]month residency training programs." The application also stated that Scholl College expected to enroll about 90 students each year, for a total of 360 in the 4-year program. The IBHE approved the application for the DPM program.

¶ 5    The plaintiff alleges that, beginning no later than 2006, there was a nationwide shortage of residency placements for DPM graduates. That is, the schools granting DPM degrees were graduating more students than the number of available residency placements. This shortage was the subject of various resolutions passed by the American Podiatric Medical Association in 2005, 2006, and 2009, calling on the podiatry schools to limit class size to the number of residencies available. Nevertheless, according to the plaintiff, the gap between the number of residencies and the number of graduating students continued to grow because the number of residencies remained constant while the number of graduates increased. The plaintiff alleges that the gap

was relatively small in 2009 (the year he enrolled at Scholl College): there were 496 residencies available nationwide and the graduating class of 2010 was 505, a discrepancy of only 9. However, by the 2013 (the year he graduated), there were 687 DPM graduates nationwide, with the result that, by the plaintiff's estimate, 191 graduates would be unable to obtain placements.

¶ 6     In 2008, the plaintiff applied to Scholl College. He was offered admission, and enrolled in the fall of 2009. His class was 103 students. The plaintiff alleges that, in deciding to enroll at Scholl College, he relied on the 2009-10 Scholl College catalog, which included the statement that there was "unprecedented opportunity for new doctors of podiatric medicine." The catalog did not mention the shortage of available residency placements, and the plaintiff alleges that he could not reasonably have discovered that shortage prior to enrollment.

¶ 7     The plaintiff completed the coursework for his degree and was awarded a DPM degree in June 2013. In addition, he took two board examinations and passed both on the first try. However, he did not obtain a residency placement. Almost all states (46), including Illinois, require DPM graduates to complete a residency before they can be licensed to practice podiatry. Thus, although the plaintiff has earned his DPM degree, he cannot practice podiatric medicine.

¶ 8     The plaintiff is not alone in this predicament. As of April 5, 2013, 110 graduating DPM students nationwide had not obtained residency placements—about 17% of the total DPM graduates. A similar percentage of Scholl College 2013 graduates had not obtained residencies.

¶ 9     After he failed to obtain a residency, the plaintiff contacted various Scholl College officials to complain and seek their help. Scholl College decided to offer DPM graduates who had not received residencies the opportunity to obtain a certificate in health administration—which would require an additional four courses and approximately one more year of study—at no cost. Scholl College also offered "preceptorships" (unpaid teaching assistant positions) to graduates without placements. The stated purpose of both options was to allow the graduates a

way to "keep current" with the field while waiting to see if they could obtain placements the following year. Citing his substantial student loans and financial pressure, the plaintiff declined to participate in either option.

¶ 10    In late 2013, assisted by counsel, the plaintiff filed suit against the defendants. The defendants moved to dismiss the complaint pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)). After briefing and oral argument, the trial court dismissed the complaint but allowed the plaintiff to replead. In May 2014, the plaintiff filed a four-count amended complaint. The defendants again moved to dismiss the complaint pursuant to section 2-615. After briefing and argument, the trial court again granted the motion, this time with prejudice. The plaintiff filed a timely notice of appeal.

¶ 11                                    ANALYSIS

¶ 12    A motion to dismiss brought under section 2-615 of the Code attacks the sufficiency of the complaint, on the basis that, even assuming the allegations of the complaint to be true, the complaint does not state a cause of action that would entitle the plaintiff to relief. 735 ILCS 5/2-615 (West 2012); *Kolegas*, 154 Ill. 2d at 8.

> "In ruling on a section 2-615 motion to dismiss, the court must accept as true all well-
> pleaded facts in the complaint and all reasonable inferences which can be drawn
> therefrom. [Citations.] In making this determination, the court is to interpret the
> allegations of the complaint in the light most favorable to the plaintiff. [Citation.] The
> question presented by a motion to dismiss a complaint for failure to state a cause of
> action is whether sufficient facts are contained in the pleadings which, if established,
> could entitle the plaintiff to relief. [Citation.] A cause of action should not be dismissed
> on the pleadings unless it clearly appears that no set of facts can be proved under the

pleadings which will entitle the plaintiff to recover." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86-87 (1996).

We review the sufficiency of the complaint *de novo*. *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002).

¶ 13 The plaintiff's amended complaint encompasses four claims, which are labeled "fraud," "fraudulent concealment," "intentional misrepresentation," and "negligent misrepresentation." In order to adequately state a claim, the complaint must allege facts that, if proven, would establish the elements of the claim asserted. *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 438 (1989). When a claim sounds in fraud, a higher degree of specificity is required. *Id*. at 457. "Thus, a plaintiff must *** plead with sufficient particularity facts establishing the elements of fraud, including what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made." *Id*. We examine each of the plaintiff's claims to see if these standards are met.

¶ 14 Counts I and III of the amended complaint assert claims of fraud. (Although count III is titled "intentional misrepresentation," this is simply another name for fraud. *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286 (1980).) The elements of a fraud claim are: (1) a false statement of fact by the defendant, (2) made with the knowledge that the statement was false; (3) the defendant intended that the statement would induce the plaintiff to act; (4) the plaintiff justifiably relied upon the statement; and (5) the plaintiff suffered damages arising from that reliance. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).

¶ 15 In count I, the plaintiff identifies two statements as allegedly false. The first is RFUMS's statement, made in its 2003 application to the IBHE for approval to offer the DPM program, that Scholl College "places its graduates" in residency programs. Given that this statement referred to a program that was not yet in existence, it cannot be construed as describing a current or past

state of affairs. Rather, it was at most a promise of future assistance to DPM graduates in obtaining residency placements. However, "[g]enerally, under Illinois law there is no action for promissory fraud, meaning that the alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct." *Ault v. C.C. Services, Inc.*, 232 Ill. App. 3d 269, 271 (1992). Moreover, the plaintiff has not alleged several other necessary elements with respect to this statement, such as that RFUMS knew that the statement was false when it was made, that the statement was made with the intent to induce him to act, or that the plaintiff relied upon the statement in deciding to pursue a DPM degree at Scholl College. Indeed, as to this last point, there is no allegation that the plaintiff was even aware of the statement at the time he enrolled at Scholl College. Thus, the allegations as to this statement do not state a claim of fraud.

¶ 16 The second allegedly false statement is the representation, contained in the plaintiff's diploma from Scholl College, that he had "honorably fulfilled all the requirements for the degree" of DPM. To begin with, there is no indication that this statement is in fact false—the plaintiff did complete the requirements to obtain the DPM *degree*, even if he did not obtain the residency he needed in order to qualify to practice as a DPM. There is a further fatal defect: the plaintiff has not alleged any way in which he could have relied upon this statement in deciding to enroll at Scholl College, inasmuch as the statement was made upon graduation, after he completed the program. And although he alleges that, through this statement, RFUMS intended to induce him to practice podiatry, the diploma does not state that he has obtained a license or is fully qualified to practice podiatry in Illinois. Moreover, the complaint clearly reflects the plaintiff's own knowledge that he cannot practice podiatry until he obtains a residency and, ultimately, a license. (For instance, the complaint cites section 11 of the Podiatric Medical Practice Act of 1987 (225 ILCS 100/11 (West 2012)), which states that it is unlawful to practice

podiatry in Illinois without a license except under the supervision of a licensed podiatrist.)  Thus, the plaintiff cannot show that he relied to his detriment on the statement in the diploma.  For all of these reasons, this statement cannot support a claim of fraud.

¶ 17    Finally, in count I the plaintiff makes reference to Scholl College's offer, made to DPM graduates who had not obtained residencies, to enroll then in the health administration certificate program.  The plaintiff alleges that this offer was made with the fraudulent intent to "buy off" DPM graduates—toward whom the defendants had breached their duty to find residency placements—with a lesser degree.  In essence, the plaintiff sketches the picture of a bait-and-switch, in which he and other students were lured with the promise of practicing a growing and lucrative profession (podiatry) and took on years of work and many thousands of dollars in loans to obtain a DPM degree, but then were offered only a comparatively worthless professional alternative.

¶ 18    This claim rests on the plaintiff's allegation that the defendants owed him and his fellow DPM students a duty "under Illinois law" to obtain residency placements for them.  However, the plaintiff fails to provide any support for his bare assertion that this duty exists.  Nowhere in his amended complaint does the plaintiff allege facts that would give rise to such a duty, and the plaintiff has not identified any legal source of such a duty.  While the resolutions adopted by the American Podiatric Medical Association strongly suggest an ethical and moral duty on the part of DPM schools to limit enrollments to the number of residency slots available to graduates, they do not establish a *legal* duty to provide DPM students with residency placements.  Similarly, although RFUMS's statement in the application to the IBHE reflected a belief that Scholl College students would obtain residencies, the plaintiff has not shown that the statement gave rise to a contractual obligation to provide or ensure such residencies for all Scholl College students.  Under these circumstances, the plaintiff has not established that the defendants could

be found legally liable for fraud based upon their conduct in offering the certificate program in health administration as an alternative for DPM graduates who did not obtain residencies. Accordingly, count I fails to state a claim upon which relief can be granted, and the trial court did not err in dismissing it.

¶ 19    We turn to count III, which raises a similar claim of fraud, based upon different statements.    In this count the plaintiff identifies two allegedly false statements:  (1) a statement in the 2009-10 Scholl College catalog that its mission was "to educate those who will serve—the students," and (2) a verbal statement that Dr. Martin Yorath, the surgery chair at Scholl College, made during a July 18, 2011, presentation to the class of 2013, to the effect that, if students passed the board examinations, they would "most likely match" (*i.e.*, obtain residencies).  As to the first statement, the plaintiff alleges that he was not truly "educated" by Scholl College, because he was unable to obtain a residency and thus cannot practice ("serve") as a podiatrist. However, this assertion rests on a matter of opinion—whether a person who successfully completes the requirements for an advanced degree has been "educated," even if he has not obtained the postgraduate residency needed in order to be licensed to practice his profession.  As a general rule, a fraud claim cannot be based on a matter of opinion.  *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 704 (2002); see also *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 571 (1998) (citing Restatement (Second) of Torts § 538A, Explanatory Note, at 83 (1977), which defines "opinion" in part as "a statement of the maker's judgment as to quality, value, authenticity or similar matters as to which opinions may be expected to differ").  Here, opinions may be expected to differ as to whether the concept of "education" involves not only the successful completion of coursework and examinations, but also placement into a postgraduate residency.  Accordingly, this statement cannot serve as the basis for a claim of fraud.

¶ 20    The same problem exists with respect to the second statement identified in count III:  it is a statement of opinion, not fact.  Indeed, the plaintiff acknowledges that Dr. Yorath expressed a belief that students who passed the board examinations would "most likely" obtain residencies.  When the speaker expresses only his own belief about a matter, without certainty, his statement is one of opinion, not fact.  *Neptuno*, 295 Ill. App. 3d at 571.  Accordingly, neither of these statements can support a claim of fraud, and the trial court did not err in dismissing count III for failure to state a claim.

¶ 21    We next consider count IV, the claim of negligent misrepresentation, as it is a close cousin to a fraud claim.  "Negligent misrepresentation has essentially the same elements [as fraud], except that the defendant need not know that the statement is false ***."  *Avon Hardware Co. v. Ace Hardware Corp.*, 2013 IL App (1st) 130750, ¶ 15.  Instead, it is enough if the defendant is careless or negligent in ascertaining whether the statement is true.  *Id*.  In addition, a plaintiff alleging negligent misrepresentation must allege that the defendant owed him a duty to communicate accurate information.  *Id*.

¶ 22    In count IV, the plaintiff alleges that the defendants made two negligent misrepresentations in the 2009-10 Scholl College catalog.  The first was this statement:  "While not all students may choose a PM&S-36 residency program, it is the aim of this Office to insure that all students are at least aware that three years of post-graduate training in a PM&S-36 program are considered the current state of the art for post-graduate training in podiatric medicine and podiatric surgery."  In his amended complaint, the plaintiff does not take issue with the second part of this statement (the assertion that "the current state of the art" for postgraduate training in podiatry is a three-year residency program).  Rather, he alleges that the defendants were negligent as to the truth of the first part of this statement—the suggestion that Scholl College students would be able to "choose" a three-year residency program if they wished.  The

plaintiff points out that, at the time this statement appeared in the catalog, Scholl College had already over-enrolled its class of 2013 in comparison to the amount of residency placements that would be available when those students graduated. The plaintiff also alleges that the defendants had a responsibility to publish accurate information in the catalog, in light of section 1030.60(a) of Title 23 of the Illinois Administrative Code, which includes the following criterion among its requirements for new degree programs:

"The information the institution provides for students and the public shall accurately describe the degree programs offered, program objectives, length of program, schedule of tuition, fees, and all other charges and expenses necessary for completion of the course of study, cancellation and refund policies, and *such other material facts concerning the institution and the program or course of instruction as are likely to affect the decision of the student to enroll*." (Emphasis added.) 23 Ill. Adm. Code 1030.60(a)(7) (2012).

¶ 23 This statement—that "not all students may choose a [three-year] residency program"—is not, in itself, a false statement of fact. Indisputably, some students who enroll in professional graduate studies eventually choose not to pursue the additional steps necessary to practice those professions. And, even viewed in the light most favorable to the plaintiff, the statement cannot be read as promising that all students will have the ability to choose among different types of residencies. Thus, this statement cannot support a claim of negligent misrepresentation.

¶ 24 The second statement the plaintiff identifies as a negligent misrepresentation is also from the 2009-10 Scholl College catalog, which stated that there was "unprecedented opportunity for new doctors of podiatric medicine." (The previous year's catalog contained a similar claim that "the options for practice within the profession are varied and the opportunities for personal growth and success are limitless.") The plaintiff asserts that the defendants were negligent in presenting these statements, as they failed to convey that the opportunity to practice as a doctor

of podiatric medicine was in fact limited, given that the number of residency placements was limited.

¶ 25    These statements about "unprecedented" and "limitless" opportunity in the field of podiatric medicine cannot form the basis for a negligent misrepresentation claim, however, because they are merely "puffing"—a seller's rosy descriptions of possible outcomes from using its product. " 'Puffing' denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined." *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 173-74 (2005). Further, projections of future performance are generally not actionable as false statements, because they are considered opinions rather than statements of present or preexisting fact. *Avon Hardware*, 2013 IL App (1st) 130750, ¶ 17. Accordingly, the allegations contained in count IV do not state a valid claim of negligent misrepresentation.

¶ 26    We therefore turn to the remaining claim asserted by the plaintiff (count II), which alleges that the defendants fraudulently concealed certain material facts from him in order to induce him to enroll in the Scholl College DPM program. First , he alleges that the defendants, in the Scholl College catalog and recruitment materials, concealed the fact that the number of residencies then available each year was insufficient to meet the needs of the likely number of DPM graduates in the class of 2013, so that some students would not obtain the residencies they would need in order to practice. Second, he alleges that the catalog made reference to "the 360 plus Scholl students" and failed to mention that RFUMS had stated, in its 2003 application, that it would enroll only 90 students per year, or mention that the Council on Podiatric Medical Education had recommended a yearly enrollment cap of 98 students. Accordingly, he failed to realize that his entering class size of 103 represented an overenrollment by Scholl College. Third, he alleges that, on November 23, 2008, he told Mandy Meinhardt, the director of

recruitment in the admissions office of Scholl College, about his hesitation to enroll and his desire to minimize his student loan burden so that he could graduate with the least amount of debt. Meinhardt responded by email the next day, stating that "[l]ast year, Scholl College had a 0% default rate for student loans," and its 10-year average for loan default was only 0.3%. The plaintiff alleges that this response omitted the material fact that Scholl College's default rate was likely to increase as a result of its increasing enrollment each year despite the lack of commensurate growth in the number of residencies available.[1]

¶ 27   To state a claim for fraudulent concealment, a plaintiff must allege the following elements: "(1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages." *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005).

¶ 28   As with other claims sounding in fraud, the information at issue must be material and must relate to an existing or past state of affairs: projections of future events generally will not support a fraud-related claim. *Rasgaitis v. Waterstone Financial Group, Inc.*, 2013 IL App (2d)

---

[1] The plaintiff also included allegations relating to the offer of enrollment in the certificate program in health administration, but these allegations are difficult to follow and he does not identify any fact regarding the program that he believes should have been disclosed to him prior to his enrollment in Scholl College. Accordingly, we disregard these allegations. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013).

111112, ¶ 40.  Further, a party cannot fraudulently conceal information that it does not know. *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 16 (1993).

¶ 29   These legal principles eliminate the second and third bases for the fraudulent concealment claim.  As to the second alleged basis, the defendants argue that they did not know exactly how many students would be in the class of 2013 until after the plaintiff (and his fellow class members) actually enrolled.  The plaintiff has not alleged how they could have disclosed this number before he enrolled.  See *id.*  Further, knowledge of RFUMS's statement that it planned to enroll 90 students per year and of the Council on Podiatric Medical Education's recommended 98-student limit would have been of little value without any knowledge of the actual class size to compare with these numbers and the number of residencies available. Without knowledge of all these numbers, the absence of information about the as-yet-unknown class size was not material.  See *Bauer*, 359 Ill. App. 3d at 902.  Similarly, as to the third alleged basis for the claim, there is no allegation that Meinhardt's statements about past loan-default rates were inaccurate, and any implied projections about future default rates related solely to future events.  The plaintiff does not allege that Meinhardt made any guarantee that past default rates would continue in the future, nor did he ask for her assessment of this risk.  In these circumstances, the mere failure to disclose factors that could influence default rates in the future cannot support a claim of fraudulent concealment.  See *Rasgaitis*, 2013 IL App (2d) 111112, ¶ 40.  We therefore set aside the second and third bases for the fraudulent concealment claim, and we examine further only the allegations relating to the first basis, the defendants' failure to disclose the residency shortage.

¶ 30   The defendants argue that the plaintiff has not alleged facts giving rise to a duty to disclose the likely shortfall in residencies available to DPM graduates.  The existence of the defendant's duty to speak is an essential part of the first element.  However, not every

relationship gives rise to a duty to speak. A duty to speak arises where the parties are in a fiduciary relationship, or where one party occupies a position of superiority or influence with respect to the other party. *Schrager*, 328 Ill. App. 3d at 707; see also *Benson v. Stafford*, 407 Ill. App. 3d 902, 918-19 (2010). A party may also be subject to a statutory duty to disclose certain facts. See, *e.g.*, *Bauer*, 359 Ill. App. 3d at 906 (seller's duty under Residential Real Property Disclosure Act (765 ILCS 77/35 (West 1996)) supported fraudulent-concealment claim).

¶ 31    Here, the plaintiff has alleged that the defendants owed him a statutory duty of disclosure under section 1030.60(a)(7) of Title 23 of the Illinois Administrative Code, requiring postsecondary institutions to "accurately describe the degree programs offered, program objectives, length of program, schedule of tuition, fees, and all other charges and expenses necessary for completion of the course of study, cancellation and refund policies, and such other material facts concerning the institution and the program or course of instruction as are likely to affect the decision of the student to enroll." 23 Ill. Adm. Code 1030.60(a)(7) (2012). The defendants argue that this provision did not give rise to a statutory duty of disclosure, citing *Moy v. Adelphi Institute, Inc.*, 866 F. Supp. 696, 708 (E.D.N.Y. 1994), but that case is distinguishable as it involved federal statutes and regulations relating to completely different matters.

¶ 32    The defendants also argue that their nondisclosure was not within the scope of their statutory duty to disclose, because the fact at issue (the shortage of residencies available to DPM graduates) related not to the DPM course of instruction itself but only to the availability of certain postgraduate options. However, in count IV of the amended complaint, the plaintiff alleges that the defendants' catalog and recruitment materials were not confined to descriptions of the course of study: the defendants also chose to describe various postgraduate options including residencies. The defendants specifically mentioned the need for a residency after graduation, stating that "a PM&S-36 residency program" was "the current state of the art for

post-graduate training in podiatric medicine and podiatric surgery," and they also made more general references to the "unprecedented" and "limitless" opportunities to practice podiatric medicine.

¶ 33    The defendants' voluntary decision to bring up postgraduate opportunities in their recruitment materials suggests that they themselves viewed such opportunities as material to prospective students' decisions about whether to enroll in the program. Accordingly, we believe that the plaintiff could adequately allege that the defendants' statutory duty included the obligation to disclose the fact that successful completion of their DPM program did not ensure placement in the necessary postgraduate residency. "A statement that is technically true may nevertheless be fraudulent where it omits qualifying material since a 'half-truth' is sometimes more misleading than an outright lie." *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 762 (2004) (citing *Perlman v. Time, Inc.*, 64 Ill. App. 3d 190, 195 (1978), quoting *St. Joseph Hospital v. Corbetta Construction Co.*, 21 Ill. App. 3d 925, 953 (1974)). Such half-truths may support a claim of fraudulent concealment. *Id*. Accordingly, we reject the defendants' argument that they owed the plaintiff no duty to disclose material facts regarding the availability of postgraduate residencies in podiatric medicine.[2]

_____

[2] The dissent suggests that, in reaching this conclusion, we are abandoning our earlier position (in affirming the dismissal of count IV) that these future-oriented statements are not factual statements that can support a claim of fraud. See *infra* ¶¶ 53-54. This is a misreading of our disposition. We are not stating that these future-oriented statements are themselves actionable misrepresentations. Rather, we are simply pointing out that their inclusion in the Scholl College recruitment materials suggests that they are within the scope of the defendants' statutory duty to accurately describe any facts that would be material to a prospective student's

¶ 34    That said, as we noted above, the allegations that the 2009-10 Scholl College catalog contained half-truths about the postgraduate opportunities available to DPM graduates were contained in count IV, not count II.  Neither count II nor count I (which is incorporated by reference into count II) contains any similar allegations.  Without any similar allegations or any express incorporation by reference of the allegations in count IV, we do not read count II as including those allegations.  Thus, as presently formulated, count II does not state a claim for fraudulent concealment of the residency shortage.

¶ 35    Nevertheless, we do not affirm the trial court's dismissal with prejudice of this claim.  As the supreme court has often noted, "[a] complaint should be dismissed with prejudice under section 2-615 only if it is clearly apparent that no set of facts can be proven that will entitle the plaintiff to recover."  *Cowper v. Nyberg*, 2015 IL 117811, ¶ 22 (citing *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 488 (1994)).  Thus, even where dismissal is appropriate under section 2-615, a plaintiff should be given leave to replead unless doing so would be futile.  Here, the presence of the necessary allegations elsewhere in the complaint suggests that further amendment of this claim would not be futile:  the plaintiff could simply expand his count II allegations to include those currently included in count IV.  Accordingly, we affirm the dismissal of this portion of count II but modify the judgment pursuant to Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) to reflect that the dismissal is without prejudice.  See *Cowper*, 2015 IL 117811, ¶ 22.

¶ 36    Lastly, the defendants attack the plaintiff's allegation that the defendants' failure to mention the shortage of residencies in their catalog and recruitment materials prevented him from discovering it.  They point out that, to plead a fraudulent concealment claim, a plaintiff

decision to enroll.

must allege either that he could not have discovered the truth through reasonable inquiry or that he was prevented from making reasonable inquiry. *Bauer*, 359 Ill. App. 3d at 902-03. The plaintiff responds that he did allege that he could not reasonably have discovered the truth, and he notes that, at this point in the case, the allegations of the complaint must be taken as true and interpreted in the light most favorable to him. *Bryson*, 174 Ill. 2d at 86-87.

¶ 37     Although "a person may not enter into a transaction with his eyes closed to available information," a plaintiff's failure to investigate the reliability of the defendant's representations is not fatal where such inquiries are inhibited by statements creating a false sense of security. *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 166 (1986). "Whether an injured party justifiably relied upon defendants' words or silence depends on the surrounding circumstances" (*id.*) and is a question of fact that is best left to the trier of fact (*id.* at 167). Although the defendants point out that the plaintiff obviously discovered the shortage of residencies at some point—he includes fairly detailed figures about the numbers of residencies and DPM students in his complaint—the complaint does not reveal when the plaintiff learned of the shortage or how difficult it was to obtain this information. Moreover, the complaint contains statistics suggesting that the discrepancy between the number of graduating DPM students and the number of residencies was fairly minor in 2009, when he enrolled, but that discrepancy increased to 17% of the 2013 graduating class nationwide by the time he graduated. A reasonable inference from these allegations is that the plaintiff could not have known when he enrolled that the discrepancy was increasing so rapidly, whereas RFUMS likely had superior knowledge in this respect.

¶ 38     Reading the amended complaint in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, we are not prepared to say that the plaintiff will not be able to prove any set of facts that would demonstrate reasonable reliance on the defendants' silence.

See *Cowper*, 2015 IL 117811, ¶ 22. Accordingly, we affirm the trial court's dismissal of count II of the amended complaint but, as to the claim that, when he was deciding whether to enroll at Scholl College, the defendants fraudulently concealed from him information about the shortfall in residencies, we modify that dismissal to reflect that it is without prejudice. On remand, the plaintiff will have an opportunity to replead this claim.

¶ 39    The dissent laments our decision to allow the plaintiff the opportunity to proceed on one of the many claims he attempted to assert in his amended complaint, and posits that this decision will open the floodgates to disgruntled graduates of professional schools who cannot find work. To the contrary, we view our decision as resting narrowly on the specific circumstances present here, as contained in the allegations of this particular complaint. In reaching this decision, we express no opinion regarding the ultimate merits of the claim. Indeed, it may well be that the plaintiff will be unable to prove his claim of fraudulent concealment, including that his reliance was reasonable. At this point, however, he deserves the opportunity to pursue his claim further.

¶ 40                                          CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County as to the dismissal with prejudice of counts I, III, and IV. As to count II, we affirm the dismissal with prejudice of the portions of the count that assert fraudulent concealment based on the failure to state the entering class size or reveal factors that could affect the student-loan default rate. We also affirm the dismissal of count II insofar as it alleges fraudulent concealment of the fact that residencies in podiatric medicine would not be available for all of the graduates of the Scholl College DPM program, but we modify that dismissal to reflect that it is without prejudice. The cause is remanded for further proceedings on that claim only.

¶ 42    Affirmed as modified and remanded.

¶ 43    JUSTICE McLAREN, specially concurring.

¶ 44    I specially concur because I believe that the current basis for determining whether a complaint was properly dismissed with prejudice, as described by the majority in paragraph 35, is flawed.  Quoting from our supreme court in *Cowper*, 2015 IL 11781, ¶ 22, the majority states that a motion to dismiss under section 2-615 should be granted with prejudice " 'only if it is clearly apparent that no set of facts can be *proven* that will entitle the plaintiff to recover.' " (Emphasis added.)  *Supra* ¶ 35.

¶ 45    Section 2-615 refers to defects relating to a pleading's sufficiency at law.  There is nothing in section 2-615 that implies that facts need to be proven for a pleading to survive an attack on its legal sufficiency.  The issue of proof does not arise under section 2-615, regardless of whether a dismissal is granted with or without prejudice.  The basis as related in *Cowper* conflates *proving* a set of facts upon which relief can be granted with *alleging* such a set of facts.

¶ 46    I submit that the proper basis for dismissal with prejudice under section 2-615 should be "only if it is clearly apparent that the plaintiff can *allege no set of facts that, even if proved*, would entitle the plaintiff to recover."  It is the plaintiff's ability to allege a legally sufficient cause of action, not his ability to prove some as-of-yet unmade allegations, that must be considered.

¶ 47    Thus, at minimum I would include a "[*sic*]" after "proven" in paragraph 35.

¶ 48    JUSTICE BIRKETT, concurring in part and dissenting in part.

¶ 49    I concur in all but the majority's disposition of count II.  I would affirm in its entirety the dismissal with prejudice of that count.

¶ 50    The majority believes that the allegations "necessary" to render count II sufficient are contained in count IV and that plaintiff need only incorporate them into count II.  *Supra* ¶ 35.  In my view, the majority takes inconsistent positions regarding these allegations.  In affirming the dismissal with prejudice of count IV, the majority takes a dim view of them.  Surprisingly,

however, the allegations spring back forcefully some paragraphs later, where the majority finds that they could quicken the moribund count II if added to it.

¶ 51    The allegations in question consist of two statements in the 2009-10 Scholl College catalog (hereinafter "catalog statements"). The first statement is: "While not all students may choose a PM&S-36 residency program, it is the aim of this Office to insure that all students are at least aware that three years of post-graduate training in a PM&S-36 program are considered the current state of the art for post-graduate training in podiatric medicine and podiatric surgery." The second statement is that there was "unprecedented opportunity for new doctors of podiatric medicine."

¶ 52    The majority affirms the dismissal with prejudice of count IV, taking what I consider the proper view of the catalog statements. First, regarding the representation that students "may choose a PM&S residency program," the majority finds that it cannot be read to imply a promise "that all students will have the ability to choose among different types of residencies," *i.e.*, that all students will receive at least one offer of residency. *Supra* ¶ 23. I agree entirely. Second, the majority regards defendants' claim of "unprecedented opportunity" for new podiatry graduates as "puffing" (*supra* ¶ 25), or an understandably exaggerated representation by a seller as to the quality of his or her product—"*the truth or falsity of which cannot be precisely determined*" (emphasis added) (*Avery*, 216 Ill. 2d at 173-74). The majority also describes the assertion as a promise of future performance, which is nonactionable because it is properly considered an opinion rather than a statement of present or preexisting fact (*Avon Hardware*, 2013 IL App (1st) 130750, ¶ 17). *Supra* ¶ 25. Again, I agree without reservation. Consequently, I concur in the majority's siding with defendants on the issue before this court as to count IV. As the majority notes, plaintiff frames that issue as whether "the defendants were negligent in presenting these statements, as they failed to convey that the opportunity to practice

as a doctor of podiatric medicine was in fact limited, given that the number of residency placements was limited." *Supra* ¶ 24. The majority does not question plaintiff's articulation of the issue, but simply disagrees with him on the merits.

¶ 53    However, the majority's characterization of the catalog statements takes an unexpected turn when the discussion reaches count II. Now the majority regards the catalog statements as "*half-truths* about the postgraduate opportunities available to DPM graduates" (emphasis added) (*supra* ¶ 34), a "half-truth" being "[a] statement that is technically true" but that omits "qualifying material" (*W.W. Vincent & Co.*, 351 Ill. App. 3d at 762). The characterization of the catalog statements as "half-truths" is integral to the majority's holding that defendants had a duty under section 1030.60(a)(7) of Title 23 of the Illinois Administrative Code to disclose the fact that not all graduates would obtain residencies. The majority says:

> "Such half-truths may support a claim of fraudulent concealment. [Citation.] Accordingly, we reject the defendants' argument that they owed the plaintiff no duty to disclose material facts regarding the availability of postgraduate residences in podiatric medicine." *Supra* ¶ 33.

¶ 54    However, in regarding as a half-truth the statement that there is "unprecedented opportunity for new doctors of podiatric medicine," the majority abandons its earlier position that the statement cannot be regarded as any kind of truth-claim or verifiable representation and, thus, is mere "puffing." *Supra* ¶¶ 24-25. Also, with respect to the statement that "not all students may choose a PM&S-36 residency program ***," the majority now apparently regards the statement as only half true, and hence misleading, because it implies that all students will have the opportunity to turn down a residency. In this way, the majority retreats from its earlier position that the statement "cannot be read as promising that all students will have the ability to choose among different types of residencies." *Supra* ¶ 23.

¶ 55　From this new premise that the catalog statements were intended as verifiable representations *and* were misleading about the availability of residencies, the majority now concludes that, if plaintiff adds the catalog statements to count II, he will have successfully pled that defendants were obligated to qualify the catalog statements with the sober truth about residency opportunities, namely that there was a "likely shortfall in residencies available to DPM graduates" (*supra* ¶ 30).　Thus, the majority now affirms exactly what it positively denied just a few paragraphs earlier—that defendants had a duty "to convey that the opportunity to practice as a doctor of podiatric medicine was in fact limited, given that the number of residency placements was limited" (s*upra* ¶ 24).

¶ 56　In response to this dissent, the majority claims that there is a distinction between viewing the catalog statements as actionable in themselves and "simply pointing out that their inclusion in the Scholl College recruitment materials suggests that they are within the scope of the defendants' statutory duty to accurately describe any facts that would be material to a prospective student's decision to enroll."　*Supra* ¶ 33 n.2.　My point is that the majority would not be finding a statutory duty to disclose the likely shortfall in residencies did it not regard the catalog statements as half-truths.　Furthermore, it is not simply because the catalog statements touch on the matter of postgraduate opportunities that the majority regards them as half-truths.　Are we to believe that, if all the catalog said on the subject was something innocuous, like "a residency is necessary for licensure in most states," the majority would find a properly pled claim of fraudulent concealment?　Not at all, I submit.　The majority's view of the problem is revealed by what it prescribes.　According to the majority, defendants had to remedy the effect of the catalog statements by "disclos[ing] the fact that successful completion of their DPM program did not ensure placement in the necessary postgraduate residency."　*Supra* ¶ 33.　This is only because the majority views the catalog statements as implying to some degree a promise that

each graduate will obtain a residency. Thus the majority contradicts how it described the catalog statements in upholding the dismissal with prejudice of count IV. *Supra* ¶¶ 23-25, 48.

¶ 57    Moreover, even assuming that the catalog statements were "half-truths," plaintiff has failed to plead the element of fraudulent concealment that concerns his responsibility for uncovering the allegedly concealed information (namely, the projection of likely residency shortages for the class of 2013). That element, which one may call the "reasonable reliance" element, is: "plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist" (*Bauer*, 359 Ill. App. 3d at 902-03). Illinois is a fact-pleading jurisdiction (*Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 26), and allegations of fraud must meet an especially high standard of specificity (*Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 15). "[The] complaint must allege, with specificity and particularity, facts from which fraud is the necessary or probable inference, including what representations were made, who made them, and to whom." *Addison v. Distinctive Homes, Ltd.*, 359 Ill. App. 3d 997, 1000 (2005).

¶ 58    Defendants, with specific references to plaintiff's count II, contend that the allegations pertaining to the reasonable-reliance element consist of conclusory or otherwise inadequate statements. The majority acknowledges defendants' challenge, but rejects it simply by noting that plaintiff responds in his reply brief that "he did allege that he could not reasonably have discovered the truth." *Supra* ¶ 36. Strangely, the majority leaves the matter at that, without identifying *where* plaintiff pled the reasonable-reliance element with the requisite specificity and particularity. I submit that plaintiff did not allege it properly anywhere. The amended complaint's paragraph 96 is representative of plaintiff's failure to plead the element:

"96. Defendants actively concealed [the] information from plaintiff and other students prior to enrollment by not disclosing it in the [2009-10 catalog], thereby preventing reasonable inquiry by prospective students."

¶ 59   First, this allegation erroneously equates mere nondisclosure with "active[] conceal[ment]."   See *Miner v. Fashion Enterprises, Inc.*, 342 Ill. App. 3d 405, 421 (2003) ("Mere silence does not amount to fraud.").   Second, even if we accepted this thin allegation as establishing a duty to disclose, plaintiff still had to plead specific facts satisfying the reasonable-reliance element.   Paragraph 96 makes no effort in that regard, but asserts, without any supporting allegations, that the nondisclosure itself "prevented reasonable inquiry."   The nondisclosure is a given here; it is a further, distinct question whether plaintiff discharged his duty of reasonable prudence.   Rather than allege specific facts on that element, plaintiff simply merged it with the element of concealment, thus leaving a fatal gap in the pleading

¶ 60   The majority opens the next paragraph (paragraph 37) of its analysis by relying on *Zimmerman* for the proposition that, while " 'a person may not enter into a transaction with his eyes closed to available information,' " the "failure to investigate" is not fatal where "[the plaintiff's] inquiries are inhibited by a defendant's statements creating a false sense of security." *Supra* ¶ 37 (quoting *Zimmerman*, 156 Ill. App. 3d at 166).   The majority quotes *Zimmerman* further:

" 'Whether an injured party justifiably relied upon defendants' words or silence depends on the surrounding circumstances' [(*Zimmerman*, 156 Ill. App. 3d at 166)], and is a question of fact that is best left to the trier of fact (*id.* at 167)." *Supra* ¶ 37.

¶ 61   Contrary to what this language might suggest, *Zimmerman* did not suggest that a plaintiff's reasonable reliance is always a question of fact. The exact language from *Zimmerman* was:

"*Under the circumstances presented here*, the issue of reasonable reliance is for the trier of fact. *Based on the pleadings*, we are not prepared to say that plaintiffs will not be able to prove any set of facts which will demonstrate reasonable reliance. [Citations.] Reasonable inferences *from the complaint* are sufficient to find that an ordinary inspection would not have disclosed the defects at issue here." (Emphases added.) *Zimmerman*, 156 Ill. App. 3d at 167.

¶ 62　The court made these remarks in discussing whether the plaintiffs, who purchased a home from the defendants, acted reasonably in accepting, without investigation, the defendants' representation that the home's basement had only one prior water leak (where, in fact, as alleged in the complaint, the basement "had suffered massive flooding of up to four feet of water" (*id.* at 161). The appeal in *Zimmerman* concerned whether the plaintiffs sufficiently alleged fraud and negligent-misrepresentation claims. The defendants contended that the element of reasonable reliance was not adequately pled, as the plaintiffs acted unreasonably by failing to look behind the basement wall paneling, where they would have discovered evidence of flooding. The appellate court rejected this contention as to both the fraud and negligence claims:

"We cannot say as a matter of law that plaintiffs closed their eyes to available information by not ripping down the panelling [*sic*] in an effort to discover the true extent of the leakage and flooding damage after defendant told them there was only one leak." *Id.* at 166.

¶ 63　Critical to the appellate court's holding was that, based on the pleadings, the plaintiffs could not have discovered the evidence of flooding through an "ordinary inspection" but would have had to tear out paneling—a degree of inspection not reasonably expected of them. *Id.* at 161, 167. Thus, the court was at pains to note that the plaintiffs' reliance *as alleged* was reasonable.

¶ 64      Unfortunately, I do not see the majority showing the same regard as did the *Zimmerman* court for our jurisdiction's pleading requirements. The majority says:

"Although the defendants point out that the plaintiff obviously discovered the shortage of residencies at some point—he includes fairly detailed figures about the numbers of residencies and DPM students in his complaint—*the complaint does not reveal when the plaintiff learned of the shortage or how difficult it was to obtain this information*." (Emphasis added.) *Supra* ¶ 37.

¶ 65      I disagree on two scores. First, the amended complaint does indeed illuminate the sources from which plaintiff obtained information about the residency shortage. Paragraphs 1 through 7 list multiple sources, many of them referenced by Internet link. Second, to the extent that the complaint is silent about when or how plaintiff obtained the information, it is elementary that the omission must be held *against plaintiff*, whose burden it was to plead that he "could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist" (*Bauer*, 359 Ill. App. 3d at 902-03). The majority considers it a "reasonable inference" that plaintiff "could not have known when he enrolled that the discrepancy [between the numbers of podiatry graduates and available residencies] was increasing so rapidly, whereas RFUMS likely had superior knowledge in this respect." *Supra* ¶ 37. The majority overlooks the requirement that a plaintiff must plead the elements of fraud with specificity and particularly (*Addison*, 359 Ill. App. 3d at 1000). Plaintiff's citation of Internet sources leads to only one inference: his access was equal to that of defendants. It was plaintiff's burden to specify otherwise, and he did not do so. To read the complaint as sufficiently pleading the element of reasonable reliance is not to infer substance from the complaint but to *impose* substance upon it. This court has no authority to relieve plaintiff of the

burden of alleging that the sources he consulted after the fact were not reasonably available to him when he made his decision to enroll in defendants' podiatry school. We view *allegations* in the light most favorable to the plaintiff; gaps we do not. Although all pleadings are to be liberally construed, a complaint must nonetheless state a cause of action by alleging facts. A failure to do so cannot be aided by any principle of liberal construction. Contrary to the majority's approach, in ruling on a section 2-615 motion to dismiss, we are to disregard "mere conclusions of law or fact unsupported by specific factual allegations." *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). Plaintiff has secured himself a windfall through slovenly pleading.

¶ 66    To close, I submit that it is simply farcical to suppose that an individual of plaintiff's education and experience could expect that his possession of a DPM degree would be a guaranteed entrée to a residency. The majority is sending this case back for plaintiff to replead, but I am confident that defendants said nothing to legitimate so naïve a belief. Therefore, I would uphold the dismissal with prejudice of all counts.

¶ 67    I would also comment on the policy aspects of today's decision. When do causes of action like this end? Plaintiff essentially claims that defendants' podiatry school had a duty to admit only enough students to fill the residencies available upon graduation. This is a practical impossibility. In fact, many professions—law, medicine, architecture, etc.—rely on the cream rising to the top. Factors such as the applicant's experience, attitude, motivation, judgment, integrity, class rank, and grade point average play an essential role in securing postgraduate placement. There is no way to predict those students who will make it. The inability of educational institutions to guarantee academic success (and, *a fortiori*, placement in residencies) was the reason the United States Court of Appeals for the Seventh Circuit held that, if presented with the issue, our supreme court would hold that Illinois does not recognize the tort of

educational malpractice or negligent admission. See *Ross v. Creighton University*, 957 F.2d 410, 415-16 (7th Cir. 1991). Subsequently, in *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶¶ 40, 42, the First District Appellate Court adopted *Ross*'s reasoning and held that the tort of educational malpractice is not cognizable in Illinois. The reasoning of both courts was that academic success cannot be scientifically predicted, subject as it is to intangible factors such as the student's attitude, motivation, temperament, experience, and home environment. *Id.* ¶ 37; *Ross*, 957 F.2d at 414. It would be equally poor policy to hold defendants accountable for plaintiff's failure to obtain a residency, which depends not only on academic success (which itself is not subject to scientific prediction) but on other factors tangible and intangible. Thus, even if there had been no residency shortage, defendants could not have guaranteed plaintiff a residency. Notably, plaintiff's complaint tells us nothing about his performance in the podiatry program other than the vague allegation that he received "adequate to excellent 'grades' in his coursework."