2016 IL App (1st) 150988

No. 1-15-0988

Fourth Division
June 30, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DARLENE BABIARZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 L 008552 |
| | ) | |
| TIMOTHY STEARNS, an Individual, | ) | Honorable |
| T.J. STEARNS, INC., an Illinois Corporation, | ) | Patrick J. Sherlock, |
| and ALLIANZ LIFE INSURANCE | ) | Judge, presiding. |
| COMPANY OF NORTH AMERICA, | ) | |
| a Minnesota Corporation, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Howse concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arises from plaintiff Darlene Babiarz's purchase of three annuities from

defendant Allianz Life Insurance Company of North America (Allianz) at the suggestion of

defendant Timothy J. Stearns. Dissatisfied with the annuities as an investment vehicle,

Babiarz filed a complaint in the circuit court of Cook County alleging breach of fiduciary

duty, negligent misrepresentation, violation of the Consumer Fraud and Deceptive Business

Practices Act (815 ILCS 505/2 (West 2012)), violation of the Illinois Securities Law of 1953 (815 ILCS 5/12 (West 2012)), common-law fraud, breach of contract to confirm annuities were suitable, breach of contract to investigate plaintiff's complaints, and negligent suitability review. Allianz and Stearns (defendants) filed motions for summary judgment and the trial court granted those motions as to the breach of fiduciary duty, Illinois Securities Law, negligent misrepresentation, common-law fraud, breach of contract to investigate Babiarz's complaints, and negligent suitability review claims. The consumer fraud claim proceeded to a bench trial at which the court granted a directed verdict in defendants' favor.[1] The remaining claim for breach of contract to confirm annuities were suitable was disposed of at a jury trial, at which the jury found in defendants' favor. Babiarz now appeals, contending that the trial court erred in granting summary judgment on her breach of fiduciary duty, Illinois Securities Law, negligent misrepresentation, and common law fraud claims because the annuities at issue in this case were securities, not insurance products. She further contends that because a fiduciary relationship existed, she was excused from reading the annuities contracts. In addition, she asserts that the court erred in granting summary judgment on the negligent suitability review claim because the *Moorman* doctrine does not apply. Finally, she argues that the court improperly determined the statute of limitations had run on her consumer fraud claim. We affirm the judgments of the trial court.

¶ 2                                    BACKGROUND

¶ 3         On August 16, 2011, Babiarz filed a complaint against Stearns and T.J. Stearns, Inc. (collectively Stearns), in the circuit court of Cook County. Subsequently, she filed a second amended complaint on August 8, 2013, in which she added Allianz as a defendant, and then a

---

[1]Although defendants motioned for a directed verdict, as the motion was presented at the close of plaintiff's evidence in a bench trial, it was actually a motion for judgment in their favor. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 262 (2010).

third amended complaint on October 14, 2014. In the third amended complaint, Babiarz alleged that Stearns made the following misrepresentations or omissions in selling her the Allianz annuities:

"a. That the annuities were the best investment vehicle for Mrs. Babiarz's life insurance proceeds;

b. Failed to disclose that the annuities did not provide Mrs. Babiarz with an income stream;

c. Failed to disclose that if money needed to be withdrawn from the annuities in order to satisfy Mrs. Babiarz's living expenses, large surrender fees and income tax penalties would be triggered by the annuities if a withdrawal was made; and

d. That this was a proper and suitable investment vehicle given Mrs. Babiarz's assets, liabilities, expenses, and financial needs;

e. Assured Mrs. Babiarz that the Endurance 15 would generate income substantially in excess of the 4% the State Farm account was paying;

f. Erroneously advised Mrs. Babiarz that she would have access to her money whenever she needed it; and

g. told Mrs. Babiarz that if she ever needed cash she could simply call him and he would have a check sent to her."

¶ 4        Thereafter, defendants filed motions for summary judgment asserting the annuities were insurance products and therefore Babiarz's claims must be dismissed because the Illinois Code of Civil Procedure (Code) (735 ILCS 5/1-101 *et seq.* (West 2012)) limits breach of fiduciary claims involving insurance producers and registered insurance firms to situations where funds have been misappropriated. They further argued that pursuant to the Code, all of

Babiarz's claims were time-barred. In ruling on the motions, the court found the fixed indexed annuities (FIAs) were insurance products and granted summary judgment in defendants' favor on the breach of fiduciary duty and Illinois Securities Law claims. The court further found that Babiarz did not reasonably rely on any alleged misstatements or omissions and therefore claims for negligent misrepresentation and common-law fraud could not be stated. Additionally, the court granted summary judgment in defendants' favor on the negligent suitability review claim based on the *Moorman* doctrine.

¶ 5    Prior to trial, Babiarz submitted an expert witness report from Jeffrey Miller as a proposed expert in the field of investment advising and investment recommendations. In ruling on whether Miller could be qualified as an expert, the court concluded that he could be "properly qualified as an expert as to the situations where an annuity is a suitable investment." However, the court barred Miller from giving his opinion as to the standard of care of an investment advisor because the claims based on breach of fiduciary duty had been dismissed.

¶ 6    The case proceeded to a bench trial on the consumer fraud claim and a jury trial on the claim for breach of contract to confirm annuities were suitable. The following facts were established at trial. Stearns is an investment advisor, securities broker, and insurance agent. He is the president of T.J. Stearns, Inc., a registered branch of LaSalle St. Securities, LLC. He is also a registered insurance producer with the Illinois Insurance Department and an appointed insurance agent for approximately 15 to 20 insurance companies, including Allianz. Allianz is an insurance company licensed by the Illinois Insurance Department. The terms of Stearns' appointment with Allianz were established by an agent agreement (Agreement). The Agreement identifies Stearns as an independent contractor with freedom to

contract with other insurance companies. The Agreement also specifically authorized Stearns:

"1. to solicit *** applications *** and to forward the applications to [Allianz] for [ ] consideration;

2. to collect the full initial premium for policies to be issued and submit promptly to the Company all premiums collected;

3. to deliver policies in accordance with any delivery requirements of the Company on a timely basis; and

4. to make reasonable efforts to maintain the Company's policies in force and to provide reasonable assistance to policy holders."

¶ 7        Allianz provides its appointed insurance agents with a "Compliance Guide." The compliance guide describes the best practices in selling Allianz annuities and what is required of Allianz insurance agents. Pursuant to the compliance guide, agents must evaluate the client's income and expenses, understand the client's short-term and long-term goals, assess the client's risk tolerance, understand the client's tax status, and consider the client's stage of life. Consistent with these requirements, agents must obtain information regarding a client's expenses such as mortgages, utilities, and grocery bills prior to selling them an annuity and keep a record of issues discussed with the client. The compliance guide further advises agents to encourage their clients to read the consumer brochure and "Statement of Understanding." In addition, agents are urged to discuss the information these documents contain in detail to ensure the features, benefits, surrender charges/schedules, and costs of the product are understood. The guide advises agents:

"Your clients need a full, unbiased explanation of their options to make informed decisions. Although these disclosures are included with the Allianz marketing and sales materials, disclosure is not just about providing brochures and other documents you hope your clients will read. You must be actively involved leading a discussion and checking for full understanding."

¶ 8    Babiarz testified that her husband, Joe Babiarz, passed away in 2009. Joe had a State Farm life insurance policy from which Babiarz received a $1 million benefit. Initially, the money was in an account with State Farm in which it earned interest at the rate of 4.5% [2] and Babiarz was paid monthly installments of $2200. Babiarz decided to withdraw the money from the State Farm account and invest the life insurance proceeds. A good friend recommended Stearns to Babiarz as an investment advisor and she contacted him. Babiarz first met with Stearns on March 9, 2009.

¶ 9    Stearns testified that from talking to mutual acquaintances, he knew that Babiarz had at least two children in college, multiple properties, and $1 million from the life insurance policy. At the March 9 meeting, Babiarz confirmed these assets and expenses. Despite the fact that Babiarz had three children, two of whom were in college, Stearns accepted without further inquiry Babiarz's alleged statement that the family expenses were only $2000 a month. Stearns admitted that he failed to ask Babiarz whether she had a mortgage on any of her properties. The notes Stearns took at the meeting list her assets as: New–$255,000 (newly purchased home); 1000 shares of GE–$20 (per share); Checking–$50,000; Old–$389,000 (family home); Wisconsin–$400,000 (lake house); IRA–$100,000; State Farm–$1 million at

---

[2]The interest rate on the State Farm account alternately is stated as either 4% or 4.5% throughout the record.

4%; and Office Condo–$200,000 (sell to current owner), rent $2,200 income. The notes further indicate that Babiarz did not have retirement savings.

¶ 10    Babiarz testified that at the initial meeting she told Stearns she could not lose money and needed the investment to make money. She would use money from the investment for living expenses. Stearns asked about the family's finances generally, but he never requested detailed information. Babiarz maintained that she told Stearns her expenses were $8000 a month. Stearns did not ask her whether she had mortgages on any of her properties.

¶ 11    Stearns testified that he met with Babiarz again on March 16, 2009. At the second meeting, he recommended that Babiarz purchase an Allianz Endurance 15 Annuity, which is a fixed indexed annuity (FIA) that was registered by the Illinois Insurance Department in 2007. He did not present Babiarz with any other product. He explained that with the Allianz Endurance 15 Annuity she would not lose principal and would earn more than the 4.5% interest rate that the life insurance benefit had been earning in the State Farm account. Babiarz would also receive a 15% bonus for purchasing the annuity. In addition, Babiarz could withdraw up to 10% of the principal annually without penalties. Stearns did not inform her that she would have to wait 20 years to withdraw her money to receive the maximum benefit. He also did not explain that there could be substantial income tax penalties for withdrawing the money earlier. Stearns testified that Babiarz did not ask him any questions. He assumed she would read the documents and if she had questions, she would have asked them.

¶ 12    To apply for the Allianz Endurance 15 Annuity, Babiarz made a $500,000 premium payment and submitted an annuity application, a "Product Suitability Form" (PSF), and a "Statement of Understanding." All of these documents were signed by both Stearns, as the

insurance agent, and Babiarz. Stearns filled out these documents with information Babiarz provided. On the PSF, Stearns listed Babiarz's monthly income as $10,000 because he assumed she was making approximately $6000 a month from her antique store. Stearns initially wrote that Babiarz's net worth was $1.8 million, but changed it to $2.8 million when Babiarz allegedly told him that her net worth was actually the greater amount. Stearns acknowledged his notes from the first meeting do not support a net worth of $2.8 million. In the section listing financial objectives, Stearns checked that Babiarz's objectives were "tax-deferred growth," "pass on to beneficiaries," and "growth-potential." The box labeled "income now" was not checked. In addition, Stearns checked the box that indicated Babiarz did not anticipate taking her first distribution for 10 or more years. Stearns testified that he was not aware that Babiarz needed income from the annuity because he knew she was selling several properties and would have a significant amount of money coming in from those sales. Immediately above Babiarz's signature on the PSF it states: "[t]o the best of my knowledge and belief, the information above is true and complete. I understand that I should consult my tax advisor regarding possible tax implications of the purchase of an annuity."

¶ 13    The statement of understanding, which was also signed by Babiarz, expressly states that the "Alliance Endurance 15 Annuity is a fixed index insurance product." It then states that the annuity is tied to a recognized market index and details the manner in which interest is calculated, the accumulation value, the surrender value, and the guaranteed minimum value of the annuity. Significantly, the paragraphs directly above Babiarz's signature state:

"I have read the information above. It has been explained to me by the agent. I understand that, during the first 10 contract years, amounts payable under this contract

are subject to a surrender charge which may result in a partial loss of premium and the loss of some or all of any interest credits earned previously.

I understand that in order to receive the Endurance Withdrawal Benefit value, including the premium bonus, I must hold this contract for at least 10 contract years, and then must receive withdrawal payments under one of the two Enhanced Withdrawal Benefit options described above. In addition, I understand that I must be at least age 60 and no older than 90 in order to elect lifetime withdrawal payments under Enhanced Withdrawal Benefit Option II.

I have also received and read the Alliance Endurance 15 Annuity customer brochure. I understand that any values shown, other than guaranteed minimum value, are not guarantees, promises, or warranties. I understand that I may return my contract within the free-look period (shown on the first page of my contract) if I am dissatisfied for any reason."

¶ 14    Babiarz testified that she was aware there was a limit to the amount she could withdraw; however, she was not aware there would be penalties if she withdrew more than that amount. She asserts that despite signing the PSF and the statement of understanding, she did not read them because she trusted Stearns. Stearns did not explain to her that she would pay surrender charges if she withdrew more than 10% of the balance within the first 10 years of purchasing the annuity. He also did not mention that there would be tax consequences for withdrawing the money prior to age 59½.

¶ 15    Babiarz's purchase of the Allianz Endurance 15 Annuity was memorialized in a contract, which was delivered to her on March 31, 2009, in a policy folder. Stearns did not instruct Babiarz to read the contract, and Babiarz did not read it. The first two pages consist of a

summary of the basic terms, including the surrender charges for the first 10 contract years. For years one, two, and three, the surrender charge is listed as 10.00%. The summary also includes a chart detailing the guaranteed and projected value of the annuity for each year based on the $500,000 premium payment. This information is repeated in greater detail, with a full explanation of all the terms, later in the contract. Regarding the surrender charges, a section labeled "Surrenders" contains an explanation of the conditions under which a surrender will be penalty free. It provides:

"To be penalty-free, a Partial Surrender must meet all of the following conditions:

• the Partial Surrender must be taken after the Contract Anniversary following your most recent Premium payment;

• the cumulative Partial Surrender amounts within a Contract Year must not exceed 10% of your total premium paid. If you request more than 10%, the amount above 10% will not be penalty-free; and

• the Partial Surrender must be taken before you begin receiving Enhanced Withdrawals."

¶ 16    Additionally, the contract states that "[y]ou may return your contract within 20 days after receiving it if you are dissatisfied for any reason. *** We will void this contract and mail a refund of any Premium you paid within 10 days of receipt of your returned contract." Further, within the policy folder was a letter from Allianz requesting Babiarz to review her financial information in the personal suitability summary, which is identical to the information provided in the PSF, and to contact Allianz if any of the information is incorrect. The contract also contains a disclosure which informs the purchaser that the annuity is a

nonqualified plan and if the purchaser is under age 59½ when a withdrawal is made, an additional 10% tax penalty may be imposed.

¶ 17     Subsequently, without being solicited, Babiarz purchased two additional Allianz Endurance 15 Annuities from Stearns. She made a $75,000 premium payment for the second annuity and a $100,000 premium payment for the third. For each of these annuities Babiarz signed an annuity application, a statement of understanding, and a PSF. Babiarz received a policy folder from Allianz for the second annuity on April 9, 2009, and received a policy folder for the third annuity on April 22, 2009. Like the first annuity, if Babiarz was dissatisfied for any reason, she had 20 days from receiving each annuity contract to cancel the contract and receive a refund of her premium payment. Babiarz maintains that she did not read any of these documents because she trusted Stearns and he did not affirmatively instruct her to read them.

¶ 18     Thereafter, Babiaraz withdrew money from the Allianz annuities on eight separate occasions beginning in June 2010 through April 2012. In March 2011, Babiarz's accountant informed her that she would suffer tax penalties for receiving income from her annuities. Thereafter, she completely surrendered the $500,000 and $75,000 annuities but continues to own the $100,000 annuity. As a result of these withdrawals, she paid surrender penalties and suffered a $4579 tax penalty on her 2010 tax return and a $5914 tax penalty on her 2011 tax return. According to Babiarz's expert witness Miller, the value of the annuities when she withdrew had grown from $675,000 to $778,659, even after the withdrawals and surrender charges. Allianz paid Stearns $54,000 in commission for the sale of the annuities.

¶ 19     At the bench trial on the consumer fraud claim, the court granted defendants' motion for a directed verdict based on the statute of limitations having run under the Consumer Fraud

and Deceptive Business Practices Act. 815 ILCS 505/10a(e) (West 2012). The final claim for breach of contract to confirm annuities were suitable was disposed of in defendants' favor at the jury trial. Babiarz filed a motion to reconsider, which was denied.

¶ 20                                    ANALYSIS

¶ 21                        Fixed Indexed Annuities are Insurance Products

¶ 22        The primary issue in this case is whether the Allianz Endurance 15 Annuity is an insurance product or a security. The resolution of this inquiry has significant consequences for Babiarz's claims because claims against insurance producers and registered firms have a two-year statute of limitations (735 ILCS 5/13-214.4 (West 2012)) and breach of fiduciary duty claims are limited to those which involve a misappropriation of funds. 735 ILCS 5/13-214.4 (West 2012). Babiarz contends that the court erred in finding that the annuities in this case were insurance products and consequently granting summary judgment on her breach of fiduciary duty and Illinois Securities Law claims. Specifically, she asserts that the annuities are investment contracts, which are securities governed by the Illinois Securities Law of 1953 (815 ILCS 5/1 *et seq.* (West 2012)), not the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2012)). Defendants respond that the court did not err in finding that the annuities are insurance products. They further assert that because they are insurance products, all of Babiarz's claims are barred by the Code's two-year statute of limitations. 735 ILCS 5/13-214.4 (West 2012).

¶ 23        Summary judgment is appropriate only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2012); *Windmill Nursing Pavilion, Ltd. v. Cincinnati Insurance Co.*, 2013 IL

App (1st) 122431, ¶ 18. The purpose of summary judgment is to determine whether a triable issue of fact exists. *Wernikoff v. Health Care Service Corp.*, 376 Ill. App. 3d 228, 233 (2007). Material questions of fact exist "where there is a dispute as to material facts or where the material facts are undisputed but reasonable persons might draw different inferences from those facts." *Id.* On review, we strictly construe the pleadings, depositions, admissions, and affidavits against the movant and liberally in favor of the nonmovant. *American Access Casualty Co. v. Griffin*, 2014 IL App (1st) 130665, ¶ 19. If any element of a cause of action is not established, summary judgment in favor of the defendant is proper. *USF Holland, Inc. v. Radogno, Cameli & Hoag, P.C.*, 2014 IL App (1st) 131727, ¶ 51. We review a grant of summary judgment *de novo. Id. ¶* 50.

¶ 24 The Illinois Securities Law of 1953 defines a security as:

"[A]ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, viatical investment, investment fund share, face-amount certificate, \*\*\* certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral lease, right or royalty, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into, relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 815 ILCS 5/2.1 (West 2012).

¶ 25    In analyzing what constitutes a security, federal courts have explained that the definition is broad and includes virtually any product sold as an investment. *Holding v. Cook*, 521 F. Supp. 2d 832, 836 (C.D. Ill. 2007) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). Black's Law Dictionary states that "a security indicates an interest based on an investment in a common enterprise rather than direct participation in the enterprise." Black's Law Dictionary 1559 (10th ed. 2014). An annuity is "[a]n obligation to pay a stated sum, usually monthly or annually, to a stated recipient." Black's Law Dictionary 109 (10th ed. 2014). Conventionally, fixed annuity contracts were an insurance vehicle whereby a purchaser made premium payments to an insurance company in exchange for periodic payments paid at a later date with a guaranteed minimum interest rate. *American Equity Investment Life Insurance Co. v. Securities and Exchange Comm'n*, 613 F.3d 166, 168 (D.C. Cir. 2012). Therefore, it follows that where a person purchases an annuity as an investment with the expectation that their money will be returned in future periodic installments, potentially accumulating to a greater amount than initially provided, the annuity is a security. Although annuities are securities, insurance products are considered exempt securities under both the federal and Illinois securities laws.[3] 15 U.S.C. § 77c(a)(3), (a)(8) (2012); 815 ILCS 5/3(M) (West 2012). Traditionally, annuities, as insurance products, have fallen under this exemption. *American Equity Investment Life Insurance Co.*, 613 F.3d at 168.

¶ 26    Federal courts have observed, however, that FIAs, such as the annuities at issue in this case, share characteristics of both investments and insurance products. *American Equity*

_____

[3]The Securities Act of 1933 expressly exempts "annuity contracts." 15 U.S.C. § 77c(a)(3), (a)(8) (2012) (The provisions of the Act shall not apply to "[a]ny insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia.").

*Investment Life Insurance Co.*, 613 F.3d at 174; *Holding*, 521 F. Supp. 2d at 836-37. FIAs were first offered in the 1990s by insurance companies and, by default, have been regulated by state insurance codes. *American Equity Investment Life Insurance Co.*, 613 F.3d at 174; *Holding*, 521 F. Supp. 2d at 836-37. Accordingly, like traditional fixed annuities, FIAs must provide the base-line protections to consumers that those codes require. *American Equity Investment Life Insurance Co.*, 613 F.3d at 168. Unlike traditional fixed annuities, however, FIAs base their interest rates on a financial market index. *Id.* at 174. Consequently, similar to a security, if the financial market does well, an FIA could have increasingly higher interest rates resulting in a greater account balance. *Id.* at 174-75. However, unlike most securities, FIAs have guaranteed minimum interest rates. Thus no possibility of loss from the unpredictability of the financial market exists. *Id.* at 174. Nevertheless, FIAs subject purchasers to more risk than traditional annuities because their interest rates will always be uncertain and purchasers can lose principal if they withdraw their money prior to a specified date and incur surrender charges. *Id.*

¶ 27 Despite the fact that FIAs have been regulated by state insurance codes, their hybrid nature has led to confusion regarding whether they would be more appropriately regulated under securities laws. *American Equity Investment Life Insurance*, 613 F.3d 166; *Holding*, 521 F. Supp. 2d 832; SEC Final FIA Rule, 74 Fed. Reg. 3138-01 (Jan. 16, 2009) (The differences between FIAs and traditional annuities have "resulted in the uncertain legal status of indexed annuities from their introduction in the mid-1990s."). After various attempts by the Securities and Exchange Commission and the federal courts to provide guidance on this issue,[4] the United States Congress alleviated the confusion in an amendment to the Dodd-

---

[4]See *American Equity Investment Life Insurance Co.*, 613 F.3d 166; *Holding*, 521 F. Supp. 2d 832; Final FIA Rule, 74 Fed. Reg. 3138-01 (2010).

Frank Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203, 124 Stat. 1376 (2010)). The amendment clarified that, generally, fixed indexed annuities are exempt from the Securities Act of 1933. Pub. L. No. 111-203, § 989J, 124 Stat. 1376 (2010).[5]

¶ 28       Although the United States Congress has clarified that FIAs are generally exempt from the federal Securities Act of 1933, the question raised in this case of whether FIAs are exempt from the Illinois Securities Law of 1953 remains. The Illinois Department of Insurance has issued a bulletin indicating its regulation of FIAs. See Ill. Department of Insurance Co. Bulletin No. 2009-5 (Apr. 13, 2009), 2009 WL 1110560. At the same time, the Illinois Secretary of State Securities Department has issued administrative decisions finding certain FIAs were investment contracts governed by the Illinois Securities Law of 1953. *In re Senior Financial Strategies, Inc.*, Ill. Securities Department Order No. 0800064 (May 24, 2011) ; *In re Richard Lee Van Dyke*, Ill. Securities Department Order No. 1100244 (Apr. 9, 2014).

¶ 29       Defendants correctly point out that the Illinois Insurance Code (215 ILCS 5/4(a) (West 2012)) classifies "annuity contracts" as insurance products and regulates annuities as insurance products in various provisions throughout the Insurance Code. See 215 ILCS 5/226 (West 2012) (annuity contracts regulation); 215 ILCS 5/229.4a (West 2012) (annuity regulation). We note, however, that the Insurance Code does not specifically refer to "fixed indexed annuities."

¶ 30       Additionally, the Illinois Division of Insurance issued a bulletin declaring that it governs FIAs. The bulletin from April 13, 2009, provides:

_____

[5]An FIA is exempt from the Securities Act of 1933 where: (1) the value does not vary according to the performance of a separate account; (2) it satisfies non-forfeiture laws; and (3) is issued on or after June 16, 2013, in a state, or issued by an insurance company that is domiciled in a state, that adopts suitability requirements that meet the Suitability in Annuity Transactions Model Regulation. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 989 J, 124 Stat.1376 (2010).

"This bulletin clarifies that annuity contracts pursuant to which benefits are dependent upon the performance of a securities or other index have been, are, and will continue to be regulated by the Illinois Division of Insurance as insurance contracts.

*** Whether an insurance producer selling indexed annuities has an alternative license does not modify, alter or otherwise change the meaning or application of these laws." Ill. Department of Insurance Co. Bulletin 2009-5 (Apr. 13, 2009), 2009 WL 1110560.

¶ 31     We note for reference that the Illinois Department of Insurance advises on its website that "[w]hen you buy an equity-indexed annuity[6] you own an insurance contract. You are not buying shares of any stock or index." Illinois Department of Insurance: Buyer's Guide to Equity-Indexed Annuities, http://insurance.illinois.gov. life_annuities /equityindex.asp (last visited June 7, 2015). Further, the Illinois Administrative Code refers to annuities as insurance products (50 Ill. Adm. Code 909.85 (eff. Jan. 1, 2008)) and specifically requires insurance producers to familiarize themselves with "fixed indexed annuities." 50 Ill. Adm. Code 3120.60(c)(4)(C) (eff. Sept. 26, 2011).

¶ 32     Additionally, FIAs are registered as insurance products with the Illinois Department of Insurance. They are not registered with the Illinois Secretary of State under the Illinois Securities Law. In fact, the Allianz Endurance 15 Annuities at issue in this case were registered with the Illinois Department of Insurance, were sold by a registered insurance producer, and were issued by a registered insurance firm. It is apparent that, in practice, the Illinois Department of Insurance regulates FIAs.

---

[6]FIAs are sometimes also referred to as "equity indexed annuities."

¶ 33    Moreover, Illinois case law suggests that FIAs are insurance products. Although this court has not ruled on whether FIAs are insurance products, we have previously held that an "annuity" is an insurance product. See *In re Nitz*, 317 Ill. App. 3d 119, 128 (2000) (holding that a structured settlement annuity was a policy of insurance); *Henderson v. Roadway Express*, 308 Ill. App. 3d 546, 552 (1999) (explaining that an annuity is an insurance policy). Additionally, in *Rasgaitis v. Waterstone Financial Group, Inc.*, 2013 IL App (2d) 111112, a case that involved FIAs,[7] this court stated that "annuities are not securities," reasoning that the annuities in that case were not registered as securities. *Id.* ¶ 37.[8]

¶ 34    Additionally, although the Illinois Securities Law of 1953 does not contain the term "fixed indexed annuity," the language of the Act further supports the conclusion that FIAs are insurance products. The law provides:

> "Exempt Securities
>
>     § 3. The provisions of Sections 2a, 5, 6, and 7 of this Act shall not apply to any of the following securities:
>
> * * *
>
>     M. Any security issued by and representing an interest in or a debt of, or guaranteed by, an insurance company organized under the laws of any state." 815 ILCS 5/3(M) (West 2012).

FIAs are issued by insurance companies organized under state law. Thus, based on the clear language of the Act they are included in this exemption.

---

[7]*Rasgaits*, 2013 IL App (2d) 111112, refers to the fixed indexed annuities as "equity indexed annuities."

[8]We note that the *Rasgaitis* court did not provide analysis on the specific issue of whether fixed indexed annuities were securities or insurance products.

¶ 35     As support for Babiarz's contention that FIAs are securities under the Illinois Securities Law, she relies on two administrative decisions from the Illinois Securities Department–*In re Senior Financial Strategies, Inc.*, Ill. Securities Department Order No. 0800064 (May 24, 2011), and *In re Richard Lee Van Dyke*, Ill. Securities Department Order No 1100244 (Apr. 9, 2014). The Illinois Secretary of State found the FIAs at issue in those cases were securities subject to the Illinois Securities Law, however, we are not bound to an administrative agency's legal interpretation. *Board of Education of Rich Township High School District No. 227 v. Brown*, 311 Ill. App. 3d 478, 483 (1999). Moreover, they do not purport to hold that all FIAs are securities and did not address the precise issue of whether FIAs are insurance products.

¶ 36     In sum, although the Illinois Securities Law and the Insurance Code do not specifically mention FIAs, they generally refer to annuities as insurance products. In addition, FIAs are registered with the Illinois Department of Insurance, not the Illinois Secretary of State. Furthermore, the Illinois Securities Law states that contracts guaranteed by registered insurance companies, which includes contracts for FIAs, are exempt. FIAs have some investment characteristics, however, their risks are limited so that FIAs are sufficiently regulated by the Insurance Code and the disclosure concerns underlying the Securities Law are not implicated. Accordingly, we hold that FIAs are insurance products exempt from the Illinois Securities Law of 1953. 815 ILCS 5/3(M) (West 2012).[9]

¶ 37                                        Statute of Limitations

¶ 38     Having concluded that the FIAs at issue in this case were insurance products governed by the Insurance Code, we must now determine whether Babiarz's claims were time-barred, as

---

[9]Variable annuities are not at issue is this case, and we express no opinion as to whether they are exempt from the Illinois Securities Law of 1953. 815 ILCS 5/1 *et seq.* (West 2012).

- 19 -

defendants assert. The trial court disposed of Babiarz's claims on other grounds; however, we may affirm the trial court's judgment on any basis that is supported by the record, regardless of whether the trial court relied on that basis. *International Insurance Co. v. Rollprint Packaging Products, Inc.*, 312 Ill. App. 3d 998, 1007 (2000).

¶ 39        The Code is clear that any action brought against an insurance producer or registered firm must be brought within two years from the date the cause of action accrued. 735 ILCS 5/13-214.4 (West 2012). In interpreting the scope of the statute of limitations provision, this court has explained that "[t]he statute as written is unequivocal and subject to only one reasonable interpretation: that *all* causes of action brought by *any* person or entity under *any* theory against an insurance producer shall be brought within two years of the date the cause of action accrues." (Emphases in original.) *Indiana Insurance Co. v. Machon & Machon, Inc.*, 324 Ill. App. 3d 300, 303 (2001); see also *Mizuho Corp. (USA) v. Cory & Associates, Inc.*, 341 F.3d 644 (7th Cir. 2003).

¶ 40        Defendants contend that Babiarz's complaint was not filed within the statute of limitations because she received the annuity contracts and signed the statements of understanding and the PSFs by April 2009. Therefore her complaint against Stearns, which was filed in August 2011 and her complaint against Allianz, which was filed in August 2013, were not timely. Babiarz responds that she was not aware of her claims against Stearns until March 2011 when she met with her accountant who informed her that she would suffer tax penalties from withdrawing funds from her annuity accounts. She further asserts that because a fiduciary relationship existed between herself and Stearns, she was excused from reading the documents that would have disclosed the relevant information to her.

¶ 41      The court employs the "discovery rule" to determine when a limitations period begins to run for claims under the Insurance Code. *Rasgaitis*, 2013 IL App (2d) 111112, ¶ 30. Under the discovery rule, the limitations period is tolled until "a person knows or reasonably should know of his injury and also knows or reasonably should know that it is wrongfully caused." (Internal quotation marks omitted.) *Id.* The date the limitations period commenced is generally a question of fact. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1986).

¶ 42      The record reveals that although the trial court disposed of the negligent misrepresentation, common-law fraud, and negligent suitability review claims on other grounds, at the bench trial on the consumer fraud claim, the court made a factual finding regarding the commencement of the limitations period. The court concluded that the limitations period began when Babiarz received the documents with information regarding the nature of the annuities, terms for the surrender penalties, and disclosure of the potential negative tax consequences. Although the court granted defendants' "motion for a directed verdict," because the motion was made at a bench trial at the conclusion of Babiarz's evidence, it was actually a motion for a judgment in their favor. *Barnes v. Michalski*, 399 Ill. App. 3d 254, 262 (2010). Accordingly, rather than applying the *de novo* standard under which motions for directed verdicts are reviewed, we review the court's ruling for whether it is against the manifest weight of the evidence. *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42 (2010). A trial court's finding is not against the manifest weight of the evidence unless it is unreasonable, arbitrary, or not based on any evidence or only if the opposite conclusion is clearly evident. *First Chicago Insurance Co. v. Molda*, 2015 IL App (1st) 140548, ¶ 52.

¶ 43    It is well settled that plaintiffs bear the burden of knowing the contents of their insurance policies. *Furtak v. Moffett*, 284 Ill. App. 3d 255, 257 (1996). Even if they do not read the policy, they are deemed to know the information the policy contains. *Foster v. Crum & Forster Insurance Cos.*, 36 Ill. App. 3d 595, 598 (1976). Insureds "ha[ve] an affirmative duty to review the terms of a new policy issued to [them]." *Golf v. Henderson*, 376 Ill. App. 3d 271, 276-77 (2007). We do not excuse the burden of knowing the contents of an insurance policy where there are no allegations that it was ambiguous. *Perelman v. Fisher*, 298 Ill. App. 3d 1007, 1011 (1998).

¶ 44    There is ample evidence in the record to support the trial court's finding that Babiarz should have known of the alleged misstatements in April 2009 when she received the policy folders. By that date, Babiarz had received the policy folders and signed the PSF and the statement of understanding, both of which contained explicit disclosures regarding the terms of the annuities. Babiarz signed her name on the PSF under a provision that certified the information it contained was true and correct to the best of her knowledge. In the statement of understanding she signed below language that stated, *inter alia*, that she had read the disclosure information, she understood that during the first 10 contract years the amounts payable under the contract were subject to a surrender charge, and she understood she could cancel the contract during the free-look period. Additionally, the policy folders she received for each annuity clearly explained the surrender charges and potential tax penalties associated with the annuities. If Babiarz had read the documents, even if she stopped reading after the first two pages of the contract, she would have been aware of each alleged misrepresentation. Babiarz, however, simply chose not to read the documents. Not only did she not read the substance of the PSF and the statement of understanding, she did not read the disclosure

language that was directly above her signature on those documents. If she had read the documents, she would have been able to cancel her contract with Allianz within the first 20 days and receive refunds for her premium payments.

¶ 45    Babiarz maintains that where a fiduciary relationship exists, failure to read insurance documents does not preclude a claim as a matter of law. We agree. An insured's duty to know the contents of his policy is "tested in light of the relationship between the insured and his agent." *Golf*, 376 Ill. App. 3d at 277. Where a fiduciary relationship exists, failure to read an insurance policy does not prevent a claim as a matter of law. *Perelman*, 298 Ill. App. 3d at 1011-12; *Black v. Illinois Fair Plan Ass'n*, 87 Ill. App. 3d 1106, 1111 (1980). This argument does not save her claims. In this case, Stearns was acting as an insurance agent, not an insurance broker. An insurance agent is a person who has a " 'fixed and permanent relation to the [insurance] companies they represent and have certain duties and allegiances to such companies.' " *Black*, 87 Ill. App. 3d at 1108 (quoting *Galiher v. Spates*, 129 Ill. App. 2d 204, 207 (1970)). In contrast, an insurance broker is an individual who solicits insurance business from the public under no employment from an insurance company and purchases insurance from the company selected by the client. *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 19.

¶ 46    Here, although Stearns happened to be licensed as an investment advisor and a broker, he was also a registered insurance producer and was appointed as an agent by Allianz, an insurance company. This relationship was established in an Agreement clearly stating that he was an insurance agent for Allianz and delineating his responsibilities. In addition, Stearns only offered Babiarz insurance products and he signed the annuity application, the PSF, and the statement of understanding on the line indicating he was the insurance agent.

Furthermore, he was paid commission for the sales of the annuities from Allianz, not Babiarz. Thus, in his interactions with Babiarz, Stearns was acting in his capacity as an insurance agent, working for an insurance company, and selling insurance products. Insurance brokers owe their clients a fiduciary duty (*Perelman*, 298 Ill. App. 3d at 1011), however, this court has consistently held that insurance agents do not. *Skaperdas*, 2015 IL 117021, ¶¶ 25-26. Therefore, Stearns did not owe Babiarz a fiduciary duty.

¶ 47     Babiarz further contends that a fiduciary relationship arose because of the high degree of trust she placed in Stearns. In support of this argument she cites *Rasgaitis*, 2013 IL App (2d) 111112. *Rasgaitis* is easily distinguishable from this case. In *Rasgaitis*, the defendant was a financial advisor who created an "investment plan" for the plaintiffs that involved them mortgaging their home. The defendant failed to disclose the complex nature of FIAs as well as known material adverse information regarding funding investments through full residential mortgages. *Id.* ¶ 35. The court noted that the cautionary language in the life insurance policies was not detailed or specific. *Id.* ¶ 36. In contrast, here, Stearns did not convince Babiarz to mortgage her home to finance an "investment plan." *Id.* Further, the documents Babiarz received and signed made clear that the annuities were "insurance products." Significantly, in this case, the documents had clear and specific disclosure language regarding surrender penalties, informed her of the free-look cancellation period, and encouraged her to read the documents that detailed the estimated value of the annuities. In addition, unlike the defendant in *Rasgaitis*, Stearns was not acting as an investment advisor, but as an insurance agent.

¶ 48     We similarly find *Khan v. BDO Siedman, LLP*, 408 Ill. App. 3d 564 (2011), unpersuasive. *Khan* involved investment advisors from an investment bank who were acting

as brokers offering an "investment strategy," not an insurance agent selling insurance products. *Id.* at 587-90. Moreover, even if a fiduciary relationship existed, the trial court did not decide the commencement of the limitations period as a matter of law. Rather, the court made a factual determination that Babiarz should have known of the alleged misrepresentations in April 2009. The trial court is in the best position to determine the "credibility of witnesses, the weight to be given to the evidence, [and] the inferences to be drawn," and we will not substitute our judgment for that of the trial court. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006). Accordingly, Babiarz was required to file her claims by April 2011. Babiarz's initial complaint was not filed until August 2011, months after the statute of limitations had expired. Babiarz's second amended complaint, in which she added Allianz as a defendant, was filed in August 2013, years beyond the two-year statute of limitations. Therefore, her negligent misrepresentation, common-law fraud, consumer law fraud, and negligent suitability review claims were properly dismissed because they were not timely filed.

¶ 49     In finding that the court did not err in granting summary judgment on plaintiff's claims, we also affirm the judgment of the lower court limiting Babiarz's expert's testimony by barring him from testifying to the standard of care for investment advisors and providing a damage analysis. The trial court barred this testimony because the claims based on breach of fiduciary duty did not survive summary judgment. Thus, the court found that this testimony was not relevant to the claims that proceeded to trial. The decision of whether to admit expert testimony is reviewed for an abuse of discretion and will not be reversed absent an abuse of that discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). The trial court in this case did not

abuse its discretion in limiting expert testimony to only the issues relevant to the claims that were still pending at the time of trial.

¶ 50　　Finally, because we find Babiarz's claims were time-barred as result of our conclusion that the Allianz Endurance 15 annuities are insurance products and not securities under the Act, we do not need to address her arguments regarding agency, reasonable reliance, and the *Moorman* doctrine.

¶ 51　　　　　　　　　　　　　　　　CONCLUSION

¶ 52　　For the foregoing reasons, we affirm the judgments of the trial court.

¶ 53　　Affirmed.